IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JAMES WILLIAMS, individually and on behalf of all others similarly situated, **Plaintiff,** v. YALE NEW HAVEN HEALTH SERVICES CORPORATION **Defendant.** | Case No. JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff James Williams ("Williams" or "Plaintiff") brings this class action lawsuit in his individual capacity and on behalf of all others similarly situated against Yale New Haven Health Services Corporation ("Yale New Haven" or "Defendant") and allege, upon personal knowledge as to his own actions, his counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     Information about a person's physical and mental health is among the most confidential and sensitive information in our society.  The mishandling of such information can have serious consequences, including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

---

[1]     *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/  ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

2.      Simply put, if people do not trust that their sensitive, private information will be kept private, they are less likely to seek medical treatment, which can lead to much more serious health consequences down the road. In addition, protecting medical information and ensuring it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

3.      Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code that can connect the individual to the collecting entity.

4.      As detailed below, Yale New Haven's illegal and widespread practice of disclosing Plaintiff's and putative Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI" and collectively with PII, "Private Information") to third parties, including, but not necessarily limited to Google, LLC ("Google"), The Trade Desk, Inc. ("Trade Desk"), StackAdapt, Inc. ("StackAdapt"), and Adobe, Inc. ("Adobe"), is an ongoing harm to its users and the healthcare system as a whole.

**Yale New Haven Collects Vast Troves of Private Information**

5.      Yale New Haven controls and maintains a website, https://www.ynhhs.org/ (the "Website"), which it encourages patients to use for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes and more.

6.      Plaintiff and members of the putative class ("Class Members" and with Plaintiff, "Users" and each a "User") who visited and used Defendant's Website understandably thought they were communicating *only* with their trusted healthcare provider.

7.      Unbeknownst to Plaintiff and Class Members, however, Defendant embedded various third-party tracking technology on its Website, including but not limited to Google

DoubleClick, the Trade Desk ID, StackAdapt Pixel, and Adobe Experience Platform Edge Network (collectively "Tracking Tools"). The Tracking Tools automatically transmit to third parties every click, keystroke and detail about Users medical treatment.

8.    Operating as designed and as implemented by Yale New Haven, the Tracking Tools allow the Private Information that Plaintiff and Class Members provide to Yale to be unlawfully disclosed to third parties, like Google.

9.    The Private Information Yale New Haven sends to third parties is also linked to Users' unique IP address or other identifiable user profiles created by the Tracking Tools.

10.    Tracking Tools are snippets of code embedded on a website (or other digital platform) that surveil and record a User's identity and activity, such as how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

11.    The User's web browser executes the Tracking Tool via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. Tracking Tools are customizable and programmable, meaning that the website owner controls which of its web pages contain the Tracking Tools and which events are tracked and transmitted to third parties.

12.    By installing Tracking Tools, Yale effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to unknowingly disclose their private, sensitive, and confidential health-related communications with Yale New Haven to third parties.

13.    Yale New Haven utilized Tracking Tools for marketing purposes to bolster its profits; that is, despite its duty to maintain the privacy of its Users' Private Information, Yale New

Haven put its own desires for profit over its patients' privacy rights.

14.    Tracking Tools are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Third parties use Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Defendant.

15.    The information that Defendant's Tracking Tools sent to third parties included the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including, for example, patient status, medical conditions searched by Users', names of providers whose profile pages were viewed by the Users, when Users click to sign in to the patient portal, when Users click to refill a prescription, when Users click to pay a bill, facility locations selected or searched by Users, User's free-text searches made via the search bar, when Users click to call their provider, Users' appointment scheduling and every page URL the User visited on the website. This information was transmitted to third parties alongside Users' personal identifiers, including IP addresses and unique cookie identifiers associated with Google and other third party tracking technologies.

16.    The information described in the preceding paragraph allows a third party (*e.g.*, Google) to learn and record that a specific patient sought confidential medical care. Third parties, in turn, sell Plaintiff's and Class Members' Private Information to fourth-party marketers who geo-target Users based on communications obtained via the Tracking Tools.

17.    Google and third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data sent by Defendant's Tracking Tools that a specific patient was being treated for a specific type of medical condition, such as cancer,

pregnancy, dementia or HIV.

## Yale New Haven's Disclosure of Users' Private Information Without Consent Violates the Law

18.    Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its web pages to an undisclosed third party without the patients' informed and express consent.

19.    Neither Plaintiff nor any other Class Members were provided, much less signed, a written authorization permitting Yale New Haven to disclose their Private Information to third parties.

20.    Despite willfully and intentionally incorporating the Tracking Tools into its Website and servers, Yale New Haven never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties.[2]

21.    Yale New Haven's overall intent and purpose in acquiring Users' Private Information was to increase its ability to market and retarget its Users, thereby increasing its profit while violating federal statutes and other laws.

22.    Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to third parties as they communicated with their healthcare providers via Yale New Haven's Website or that their information was stored on Yale New Haven's servers to be later transmitted to third parties so it could be used for targeted advertising and marketing

---

[2]    In contrast to Defendant, several medical providers, have notified their patients of the fact that similar tracking technologies disclosed Private Information to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022)https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), https://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal/.

purposes.

23.     As detailed below, Defendant owed statutory, regulatory, and contractual duties to keep Plaintiff's and Class Members' communications and medical information safe, secure and confidential.

24.     The disclosure of Plaintiff's and Class Members' Private Information via the Tracking Tools contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Pursuant to HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule"), which governs how health care providers must safeguard and protect Private Information.

25.     Pursuant to the Privacy Rule, covered entities such as Yale New Haven are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent from each patient.

26.     Lest there be any doubt of the illegal nature of Yale New Haven's practice, the Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the unlawful transmission of such protected information violates the Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[3]

---

[3]     *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 8, 2026) (emphasis added).

27.    The HHS Bulletin does not change any existing rule or impose any new obligation on HIPAA-covered entities. Instead, it reminds these entities of their long-standing obligations by referring to guidance and rules that have been in place for decades. *Id.* ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").

28.    In contrast to Yale New Haven, several medical providers that used Tracking Tools in a similar way have provided their patients with notice that their Private Information was transmitted to third parties.[4]

29.    Yale New Haven, moreover, made express promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

30.    Yale New Haven breached its statutory, regulatory and contractual obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review its marketing programs and web based technologies to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users' Private Information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Google and other third parties; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools; (v) failing to warn Plaintiff and Class Members of sharing their Private Information with third parties and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality, security and

---

[4] *See supra* n.2.

integrity of patient Private Information.

31. As a result, Plaintiff and Class Members have suffered numerous injuries, including: (i) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Tracking Tools, (ii) loss of benefit of the bargain, (iii) diminution of value and loss of control of the Private Information, (iv) statutory damages and (v) the continued and ongoing risk to their Private Information.

32. Plaintiff therefore seeks on behalf of himself and a class of similarly situated persons, to remedy these harms and assert statutory claims against Yale New Haven for: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, and (ii) negligence.

**PARTIES**

33. James Williams is a natural person and a citizen of the State of Connecticut. Plaintiff has been a patient of Yale New Haven and a user of *www.ynhhs.org* since at least 2014. Plaintiff has maintained a Facebook account since at least 2021 and has maintained a Google account since at least 2014. During the relevant time period, Plaintiff has used the Yale New Haven Website to schedule appointments, request information on specific medical services, research providers and locations, review financial assistance resources and login to Defendant's portal, called "MyChart." By doing so, Plaintiff's individually identifiable health information was disclosed to third parties under the systematic process described above. Plaintiff had no knowledge his sensitive medical information was shared with Google or other third parties and gave no consent or authorization for Yale New Haven to disclose his individually identifiable health information.

34. Yale New Haven Health Services Corporation is a nonprofit, integrated healthcare

system headquartered in New Haven, Connecticut, serving patients throughout Connecticut as well as portions of New York and Rhode Island. Yale New Haven Health includes multiple acute-care hospitals, a physician network, multispecialty centers, and numerous outpatient and ambulatory facilities, and provides a wide range of medical services including primary care, specialty care, cancer treatment, cardiovascular care, neurology, and other advanced medical services.

35.     Yale New Haven is a covered entity under HIPAA.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged form part of the same case or controversy.

37.     This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), which expressly provides federal courts with jurisdiction over any class action in which: the proposed class includes at least 100 members; any member of the class is a citizen of a state and any defendant is a citizen or subject of a foreign state; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

38.     This Court has personal jurisdiction over Yale New Haven because it operates and maintains its principal place of business in this District. Further, Yale New Haven is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of its Website in this District, including decisions regarding the privacy of Users' Private Information and the incorporation of Tracking Tools.

39.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in, and is subject to, personal jurisdiction in this District. Venue is also proper in this

District because a substantial part of the events or omissions giving rise to the claim occurred in, and emanated from, this District.

## COMMON FACTUAL ALLEGATIONS

**A.   Background: The Use of Tracking Technologies in the Healthcare Industry**

40.    Tracking Tools installed on many hospitals', telehealth companies' and other healthcare providers' websites (and other digital properties) are collecting patients' and other visitors' confidential and private health information—including details about their medical conditions, prescriptions and appointments, among many other things—and sending that information to third-party vendors without prior, informed consent.

41.    These Tracking Tools are snippets of code that track users as they navigate through a website, logging which pages they visit, which buttons they click and certain information they enter into forms. In exchange for installing the Tracking Tools, the third-party platforms (*e.g.,* Facebook and Google) provide website owners with analytics about the advertisements they have placed as well as tools to target people who have visited their websites.

42.    While the information captured and disclosed without permission may vary depending on the Tracking Tools embedded, these "data packets" can be extensive, sending, for example, not just the name of the physician and her field of medicine, but also the first name, last name, email address, phone number, zip code and city of residence entered into a booking form.

43.    The data set forth in the preceding paragraph is linked to a specific internet protocol ("IP") address and several forms of unique identifier cookies. These cookies enable third-party vendors like Google to create a comprehensive user profile by connecting web activity to an existing account or, even if the User is not signed in to such accounts, to another unique user profile.

44.    IP addresses are considered PHI when connected to treatment records or other

protected information under HIPAA.[5]

45.     Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their Users' personal health information.

46.     Specifically, and for example, *The Markup* reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Meta a packet of data whenever a person clicked a button to schedule a doctor's appointment.[6]

**B.     Yale New Haven Installed and Utilized Tracking Technology for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Third Parties.**

47.     Yale New Haven purposely installed Tracking Tools including but not limited to Google's DoubleClick tools, the Trade Desk ID, StackAdapt Pixel, and Adobe Experience Platform Edge Network tools on its Website and programmed the Website to surreptitiously share its patients' private and protected communications with third parties, including communications containing Plaintiff's and Class Members' Private Information.

48.     On numerous occasions, with the most recent in 2026, Plaintiff James Williams accessed Yale New Haven's Website on his mobile device and computer and used the Website to schedule appointments, request information on specific medical services, research providers, review financial assistance resources and login to MyChart.

49.     Yale New Haven assisted third party vendors with intercepting Plaintiff's communications, including those containing Private Information.

---

[5]     *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

[6]     *See* Ash Aryal, *Google Analytics for Healthcare Websites: Harnessing Powerful Insights to Supercharge Your Practice*, Digital Spotlight (October 4, 2024), available at https://www.digitalspotlight.com/google-analytics-healthcare-websites/ (last visited Mar. 8, 2026).

50.     Yale New Haven assisted these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Yale New Haven breached its duties of confidentiality and unlawfully disclosed Plaintiff's Private Information.

**C.     Google's Tracking Tools Including Google DoubleClick**

51.     By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google Doubleclick and Google AdWords.

52.     Yale New Haven deploys Google Doubleclick tracking on its website.

53.     Google Doubleclick is a third-party advertising service that tracks users across the Internet using personally identifiable data and communications to place targeted advertisements.

54.     Yale New Haven uses various means of identification, including cookies, to help Google Doubleclick acquire and record Users' data and the content of their communications without their knowledge, action, authorization, or consent.

55.     The cookies and identifiers used by Yale New Haven's Website that enable Google DoubleClick and Google Ads to acquire and record patient communications and patient-identifying information include, as discussed above, the cookies named IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, each of which functions as a persistent personal identifier when received by Google and is used by Google's advertising and analytics systems to associate user activity—including the patient communications transmitted to

Yale New Haven—with Google's existing user and device profiles.

56.    Yale New Haven installed Google's Tracking Tools, including Google DoubleClick, as well as other tracking technologies, on many (if not all) of the webpages within its Website and programmed or permitted those webpages to surreptitiously share patients' private and protected communications with Google—communications that included Plaintiff's and Class Members' Private Information.

57.    Plaintiff's and Class Members' Private Information would not have been disclosed to Google via the Google Tracking Tools but for Yale New Haven's decision to install and implement those tools.

58.    By installing and implementing Google Tracking Tools, Yale New Haven caused Plaintiff's and Class Members' communications to be intercepted and transmitted to Google via the Tracking Tools.

66.    While Defendant's patients navigate Yale New Haven's Website, the Website provides Google with their IP addresses and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, names of providers whose profile pages were viewed by the patient, appointment requests, when patients click to sign in on the patient portal, click to pay a bill, click to refill a prescription, any free-text searches made by patients, every page a patient visited and when patients click a provider's phone number to call for an appointment.

67.    This is precisely the type of identifying information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients.[7] Plaintiff's and Class Members identities

---

[7]*See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 8, 2026).

can be easily determined based on IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

68.     Google advertising technologies do not operate anonymously. Google expressly confirms that cookies may be used in conjunction with other advertising technologies and that server logs include identifiers that distinguish and, when a user is signed-in, may uniquely identify a user. Google states that in the context of advertising "we store a record of the ads we serve in our logs," and that those logs "typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[8]

69.     Google's tracking ecosystem uses cookies that are personally identifying to Google. Google explains that "cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time."[9]

70.     Google also uses advertising cookies to target and deliver ads, including across non-Google sites. Google states: "The 'IDE' cookie is used to show Google ads on non-Google sites," and that "The 'NID' cookie can be used to show ads in Google services for signed-out users." In addition, Google explains that "the 'DSID' cookie is used to identify a signed-in user on non-Google sites," confirming that Google can recognize a logged-in user even while that user browses a third-party website.[10]

71.     The Private Information disclosed via the Tracking Tools allow Google to know that a specific patient is seeking confidential medical care and the type of medical care being

---

[8] Google, Advertising & Measurement Technologies, *https://policies.google.com/technologies/ads* (last visited Mar. 8, 2026).

[9] Google, How Google Uses Cookies & Similar Technologies, *https://policies.google.com/technologies/cookies?hl=en-US* (last visited Mar. 8, 2026).

[10] *Id.*

sought. Google then uses that information to sell advertising to Yale New Haven and other advertisers and/or sells that information to marketers who use it to online target Plaintiff and Class Members.

72.     The third parties that receive information from the Google Tracking Tools and/or user data and communications for their own marketing purposes and for the marketing purposes of the website owner. Ultimately, the purpose of collecting user data is to make money.

73.     Thus, without any knowledge, authorization or action by a user, website owners like Yale New Haven use embedded tracking code to commandeer the user's computing device, causing the device to contemporaneously and surreptitiously re-direct the users' communications to third parties, including but not limited to Google.

74.     In this case, Yale New Haven employed the Google Tracking Tools described above to intercept, duplicate and re-direct Plaintiff's and Class Members' Private Information to third parties.

75.     In sum, the Google Tracking Tools on the Website transmitted Plaintiff's and Class Members' highly sensitive communications and Private Information to third parties, which communications contained private and confidential medical information.

76.     As explained below, these unlawful transmissions are initiated by Yale New Haven's source code concurrent with communications made via the Website.

**D.     The Trade Desk Tracking Tools, Including The Trade Desk ID.**

77.     The Trade Desk is a digital advertising platform that provides technology to help advertisers and their advertising agencies manage digital advertising campaigns across many channels. The Trade Desk uses tracking pixels and cookies to track users' browsing activity online.

This data helps deliver targeted advertising based on users' interests and behaviors.[11]

78.    When a user visits a website using The Trade Desk services, the website may include a piece of code provided by the Trade Desk, typically in the form of a JavaScript tag. This code allows the website to communicate with The Trade Desk's platform.

79.    Upon loading the webpage, the code provided by The Trade Desk may trigger a request to The Trade Desk's servers, *adsrvr.org*. The Trade Desk's servers handle the request and may set a tracking cookie in the user's browser known as The Trade Desk ID (TDID). The TDID is a persistent, unique identifier that functions like a digital fingerprint, enabling the Trade Desk to track users across different websites, devices, and browsing sessions.[12]

80.    In addition to the TDID, The Trade Desk also collects IP addresses, which provide geolocation data with more than 95% accuracy. By combining IP addresses with TDID cookies, the platform can not only pinpoint a user's geographic location but also distinguish between multiple people using the same household or workplace network, and even map behavioral patterns as individuals move between home, work, and other locations.[13]

81.    The data intercepted by The Trade Desk is not limited to general browsing. It may also include sensitive health-related information (such as physician searches, appointment scheduling, or specific medical conditions researched) when its tracking code is embedded in healthcare websites. This allows The Trade Desk to build comprehensive profiles of individuals that merge medical interests with broader online behaviors.

82.    The Trade Desk platform then uses the collected data to perform cross-device mapping and behavioral segmentation. This enables advertisers to create granular audience

---

[11] The Trade Desk, *The Trade Desk*, https://www.thetradedesk.com (last visited Mar. 8, 2026).
[12] The Trade Desk, *Website Privacy Policy*, https://www.thetradedesk.com/legal/privacy (last visited Mar. 8, 2026).
[13] *Id*.

profiles and deliver ads that are tailored to a person's inferred health status, interests, and digital footprint. By adding this information into its vast advertising ecosystem, The Trade Desk can run real-time bidding campaigns where advertisers compete to display targeted ads to users whose profiles reveal a high likelihood of interest in specific services or products.[14]

83.    Additionally, The Trade Desk engages in **cookie syncing**, a process that allows it to match the TDID with identifiers used by other advertising platforms. When a webpage loads The Trade Desk's code, the browser may be redirected to partner domains to exchange and align user IDs. For example, The Trade Desk syncs IDs with Rubicon Project, a tracking technology developed by Magnite Inc., which describes itself as *"the world's largest independent sell-side advertising company"* and provides software that helps publishers monetize content across CTV, online video, display, and audio.[15] According to The Trade Desk's own documentation on cookie syncing this ID-matching process enables participating companies to recognize the same user across systems and improve the precision of targeted advertising.[16]

84.    Yale New Haven installed and utilized The Trade Desk Tracking Tools on its Website and programmed those technologies to operate in a manner that caused Plaintiff's and class members' communications, activity and identities to be transmitted to The Trade Desk and other third parties in connection with The Trade Desk's advertising and analytics services.

**E.    StackAdapt Tracking Tools, including the StackAdapt Pixel.**

85.    StackAdapt is a programmatic advertising company that operates a demand-side platform (DSP) used by marketers to buy digital ad inventory across websites, mobile apps, and connected TV through real-time bidding auctions. The company describes its DSP as infrastructure

---

[14] *Id.*

[15] Magnite, *About Us*, https://www.magnite.com/about-us/ (last visited Mar. 8, 2026).

[16] The Trade Desk, *Cookie Mapping*, https://partner.thetradedesk.com/v3/portal/ssp/doc/CookieMapping (last visited Mar. 8, 2026).

for brand and performance marketing and states that it processes billions of ad requests every day. Through this system, StackAdapt helps advertisers reach users based on inferred interests, browsing patterns, and audience segmentation models.[17]

86. StackAdapt also provides marketers with the StackAdapt Pixel, a JavaScript tracking tag placed on advertisers' websites. According to StackAdapt's product materials for the Pixel in its industry solutions documentation, the Pixel collects information about on-site behavior such as page views, referrers, user actions, conversions, and custom events. This information is used to build audiences, measure performance, and attribute advertising results to specific users.[18]

87. When the Pixel loads, it communicates with tags.srv.stackadapt.com, which sets a persistent tracking identifier known as the sa-user-id. Third-party documentation confirms that the sa-user-id cookie, including variants like sa-user-id-v2 and sa-user-id-v3, is used to record details about a visitor's activity, such as the pages they viewed and the locations they accessed.[19]

88. Yale New Haven installed and utilized the StackAdapt Tracking Tools, including the StackAdapt Pixel on its Website and programmed those technologies to operate in a manner that caused Plaintiff's and class members' communications, activity and identities to be transmitted to StackAdapt and other third parties in connection with StackAdapt advertising and analytics services.

**F.     Adobe Tracking Tools, including the Adobe Experience Platform Network.**

89. The Adobe Experience Platform Edge Network ("Adobe") is a real-time data

---

[17] StackAdapt, *StackAdapt*, https://www.stackadapt.com (last visited Mar. 8, 2026); StackAdapt Tech Blog, *In-App Advertising and SKAdNetwork*, https://stackadapt.tech/in-app-advertising-and-skadnetwork-ffb871d231d8 (last visited Mar. 8, 2026).

[18] StackAdapt, *Retail Industry Advertising Solutions*, https://www.stackadapt.com/industry-solutions/retail (last visited Mar. 8, 2026).

[19] BrainCheck, Inc., *Cookie Policy*, https://braincheck.com/cookie-policy/ (last visited Mar. 8, 2026).

collection service and a core component of Adobe's tracking infrastructure.[20] This service is activated through the domain edge.adobedc.net, which appears in browser requests when the tool is in use.[21] The Edge Network collects user interactions from websites and transmits them to Adobe's servers. During this process, users are assigned a persistent identifier called the Experience Cloud ID ("ECID"), which allows Adobe to recognize individuals across sessions, devices, and channels, even when they are not logged in.[22]

90. The ECID is not a neutral or anonymous technical identifier. It serves as the foundation of Adobe's broader identity resolution system, which includes the Identity Graph, a mechanism that links ECID's with additional identifiers such as hashed email addresses, loyalty IDs, and CRM records. This process generates a unified user profile across platforms and devices.[23]

91. A key component of this tracking system is the browser cookie named "kndctr_{ORG_ID} _AdobeOrg_identity." This cookie "contains user identity details," including the ECID, and is sent with each request to Adobe's servers. This allows Adobe to persistently identify and track returning visitors across sessions and pages.[24]

92. The data collected via the Edge Network, including the ECID, can be used for targeted advertising, as Adobe Audience Manager relies on the ECID as a core identifier to

---

[20] Adobe, *Connections*, https://business.adobe.com/products/real-time-customer-data-platform/connections.html (last visited Mar. 8, 2026).

[21] Adobe, *Adobe Experience Platform Edge Network*, https://developer.adobe.com/client-sdks/edge/edge-network/ (last visited Mar. 8, 2026).

[22] Adobe, *Experience Cloud ID (ECID)*, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/ecid (last visited Mar. 8, 2026).

[23] Adobe, *Identity Graph Viewer*, https://experienceleague.adobe.com/en/docs/experience-platform/identity/features/identity-graph-viewer (last visited Mar. 8, 2026).

[24] Adobe, *Identity Overview*, https://experienceleague.adobe.com/en/docs/experience-platform/collection/use-cases/identity/id-overview (last visited Mar. 8, 2026); Adobe, *Personalization Overview*, https://experienceleague.adobe.com/en/docs/experience-platform/collection/use-cases/personalization/pers-overview (last visited Mar. 8, 2026).

build behavioral audience segments and activate them across ad platforms.[25]

93.    Yale New Haven installed and utilized the Adobe Tracking Tools, including the Adobe Experience Platform Network on its Website and programmed those technologies to operate in a manner that caused Plaintiff's and class members' communications, activity and identities to be transmitted to Adobe and other third parties in connection with Adobe's advertising and analytics services.

**G.    Defendant's Method of Transmitting Plaintiff's and Class Members' Private Information via the Tracking Tools.**

94.    Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (such as computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser and Microsoft's Edge browser).

95.    Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

96.    Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP

---

[25] Adobe, *Audience Manager*, https://experienceleague.adobe.com/en/docs/audience-manager (last visited Mar. 8, 2026); Adobe, *Index of IDs in Audience Manager*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/ids-in-aam (last visited Mar. 8, 2026)

Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

● **Cookies**: a small text file that can be used to store information on the client device, which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

**HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[26]

81.     A patient's HTTP Request essentially asks Yale New Haven's Website to retrieve certain information (such as a physician's "Request an Appointment" page), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate the Website).

82.     Every website consists of Markup and "Client-Side Code."

83.     Client-Side Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

84.     Client-Side Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

85.     Defendant's Tracking Tools consist of embedded third-party JavaScript that does just that. A Tracking Tool acts much like a traditional wiretap by surreptitiously transmitting a Website User's communications and inputs to third parties.

---

[26]     One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

86.     When patients visit Defendant's Website via an HTTP Request to Yale New Haven's server, Defendant's server sends an HTTP Response (including the Markup) that displays the webpage visible to the user, along with Client-Side Code (including Yale New Haven's Tracking Tools).

87.     Thus, Yale New Haven is, in essence, handing patients a tapped device and once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the Tracking Tools, which intercept those communications—intended only for Yale New Haven—and transmits those communications to third-parties, including but not limited to Google.

88.     Third parties, like Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the patient associated with the personal information intercepted (in this case, highly sensitive Private Information).

89.     The third parties to whom a website transmits data through Tracking Tools are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.*, to bolster profits).

90.     Thus, without any knowledge, authorization, or action by a user, a website owner like Yale New Haven can use its Tracking Tools to commandeer a User's computing device, causing the device to contemporaneously and invisibly redirect the Users' communications to third parties.

91.     In this case, Yale New Haven employed the Tracking Tools to intercept, duplicate and redirect Plaintiff's and Class Members' Private Information to third parties.

92.     Anyone who visits Yale New Haven's Website is presented with a search bar and

seven buttons that provide the following options: "Find a Doctor," "Get Care Now," "Services," "Locations," "Patients & Visitors" and "MyChart." Clicking the "Find a Doctor" button presents patients with a list of relevant doctors. Following that, patients can click to view a doctor's profile, which includes information about that doctor and patient reviews. From that page, patients can click to call for an appointment, or login to MyChart to schedule an appointment.

93.     For example, as shown in Figure 1 below, if a patient clicks "Find a Doctor," and searched for "cancer" they will receive a list of doctors. Then, they can click to call for an appointment or submit an online request for an appointment form. At every stage, Tracking Tools implemented in the Defendant's source code automatically tracks and transmits Users' communications, contemporaneously and without the Users' knowledge.



*Figure 1. Search results for "cancer" in Find a Doctor search bar*

94.     Figure 2 depicts the tracking activity that occurs when a user searches for "cancer"

using the "Find a Doctor" feature shown in Figure 1. At that time, Tracking Tools embedded in Defendant's source code record and transmit information reflecting the user's search term and interaction with the search function, along with associated unique identifiers, to Google for analytics and advertising purposes.

| | |
|---|---|
| _v | j102 |
| a | 1236555692 |
| t | event |
| ni | 0 |
| _s | 1 |
| dl | https%3A%2F%2Fwww.ynhhs.org%2Ffind-a-doctor |
| ul | en-us |
| dt | Find%20a%20Doctor%20-%20Yale%20New%20Haven%20Health |
| sr | 1440x900 |
| vp | 605x812 |
| ec | search%20box |
| ea | searchboxSubmit |
| el | cancer |
| ev | 573 |
| _u | QACAAEABAAAAACAAI~ |
| jid | |
| gjid | |
| cid | 2039255005.1772645762 |
| tid | UA-47131147-1 |
| _gid | 251609109.1772923905 |
| _slc | 1 |
| gtm | 45He6341n71KPD7LWv71263927za200zd71263927 |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 102015666~103116026~103200004~115938466~115938469~116024733~117484252~117625641 |
| z | 229565545 |

*Figure 2. Tracker contemporaneously transmits contents of Find a Doctor search to Google.*

95.    Figure 3 shows the user-facing webpage that appears after a user selects a physician from the search results, displaying the physician's profile and options to contact the provider or request an appointment.



*Figure 3. User view after clicking on Dr. Karellas from Find a Doctor Search results.*

96.      Figure 4 depicts the tracking activity that occurs when the physician profile shown in Figure 3 loads. At that time, Tracking Tools embedded in Defendant's Website automatically transmit information about the specific page viewed and the user's interaction and selection, along with unique identifiers, to Google for analytics and advertising purposes.

| | |
|---|---|
| cv | 11 |
| fst | 1773074006414 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| en | conversion |
| gtm | 45be6350v9189882162z871263927za20gzb71263927zd71263927xea |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 103116026~103200004~115938466~115938469~116024733~117484252~117625639 |
| u_w | 1440 |
| u_h | 900 |
| url | https://www.ynhhs.org/physicians/michael-e-karellas |
| ref | https://www.ynhhs.org/find-a-doctor |
| label | lgzGCMWHzKIaEILOv9ED |
| capi | 1 |
| frm | 0 |
| tiba | Michael E. Karellas, MD, FACS Urology \| Greenwich Hospital |
| bttype | purchase |
| value | 0 |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 1186749944.1772645171 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3AA-Brand;99.0.0.0\|Google%20Chrome;145.0.7632.117\|Chromium;145.0.7632.117 |

*Figure 4. Tracker contemporaneously transmits user's action—Clicking on Dr. Karellas—to Google.*

97.    From the page on Figure 3, if the patient clicks "Book Appointment" button, the Tracking Tools embedded in Defendant's Website automatically transmits unique identifiers and information reflecting the patient clicked the "Book Appointment" button on Dr. Hamdan's profile page, to Google for analytics and advertising purposes. This disclosure is depicted in Figure 5 below.

26



| | |
|---|---|
| en | conversion |
| gtm | 45be6350v9189882162z871263927za20gzb71263927zd71263927xea |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 103116026~103200004~115616985~115938466~115938469~116024733~117477894~117484252 |
| u_w | 1440 |
| u_h | 900 |
| url | https://www.ynhhs.org/schedule-an-appointment?physicianId=62ADBF4ACBF04F0EB23CA899438AF917 |
| ref | https://www.ynhhs.org/physicians/michael-e-karellas |
| label | lgzGCMWHzKIaEILOv9ED |
| capi | 1 |
| frm | 0 |
| tiba | Schedule an Appointment - Michael E. Karellas, MD, FACS |
| bttype | purchase |
| value | 0 |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 1186749944.1772645171 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3AA-Brand;99.0.0.0|Google%20Chrome;145.0.7632.117|Chromium;145.0.7632.117 |
| uamb | 0 |
| uam | |
| uap | macOS |

*Figure 5. Tracking Tools transmit the "click to call" Dr. Hamdan to Google.*

98.     Yale New Haven's Tracking Tools intercepts and discloses to Google and other third parties both the "contents" of individuals' communications on the Yale New Haven's Website (*i.e.,* the URLs, buttons, links, pages, and tabs they view and the information entered into the Website's forms) and identifiers that can uniquely identify the patient (*i.e.,* the individuals' IP addresses, cookie identifiers, device identifiers and account numbers).

99.     Once a patient chooses a doctor, all of the information that patient has submitted is

automatically sent directly to third parties, including but not limited to Google. The information transmitted to third parties includes, (i) the fact that the patient clicked on a specific provider's profile page (ii) the patient's search parameters and (iii) whether the patient called the provider or logged into MyChart to schedule an appointment.

100. If a User searches for treatment or a particular condition on Yale New Haven's Website, such as "breast cancer" or "infectious disease," the Tracking Tools send that information to third parties as well.

101. Each time Yale New Haven sends this activity data, it also discloses a patient's personally identifiable information alongside the contents of their communications.

102. Thus, Defendant reveals to Google and other third parties the exact links and pages website users click and view and discloses extensive insight into the user's past, present, and/or future health care, which qualifies as protected health information under HIPAA. *See* 18 U.S.C. § 2510.

103. This example highlights just one of the hundreds (if not thousands) of paths on Yale New Haven's Website demonstrating how Defendant's Website surreptitiously collects and transmits protected health information to its third-party vendors.

104. The disclosures described above are taking place without Users' consent.

105. Thus, without the consent of visitors to its Website, Defendant has effectively used its source code to commandeer Users' computing devices thereby re-directing their Private Information to third parties.

106. The information Defendant's Tracking Tools send to Google and other third parties may include, among other things, Users' PII, PHI and other confidential information.

107. Consequently, when Plaintiff and Class Members visit Yale New Haven's Website

28

and communicate their Private Information, it is transmitted to Google, Microsoft and other third parties, including, but not limited to: (i) medical conditions and specialties searched by Users; (ii) the names and profiles of healthcare providers viewed by Users; (iii) facility locations selected or searched by Users; (iv) the content of Users' free-text searches conducted via the Website's search bar; (v) the full-string URLs of pages visited by Users, which encode and reflect the substance of Users' healthcare-related browsing activity; (vi) when Users click a provider's phone number to call for an appointment, which is captured and transmitted as a discrete tracked even; (vii) when Users click to refill a prescription or pay a bill; (viii) Users' personal identifiers transmitted contemporaneously with the foregoing, including IP addresses and unique cookie identifiers associated with each third-parties' own Tracking Tools. The URLs transmitted to third parties further reflect when Users navigate to pages associated with scheduling appointments, contacting providers, or accessing the patient portal.

**H.     Yale New Haven's Tracking Tools Caused Plaintiff's and Class Members' PII and PHI to be Sent to Third Parties.**

111.    Yale New Haven utilizes and intentionally installed the Tracking Tools on its Website to secretly track patients by recording their activity and experiences in violation of its contractual, statutory and regulatory duties and obligations.

112.    Yale New Haven's Website contains multiple unique identifiers associated with Google Tracking Tools (including Google DoubleClick), The Trade Desk (including the Trade Desk ID), StackAdapt (including the StackAdapt Pixel), and Adobe (including the Adobe Experience Platform Edge Network tools), which indicate that the Tracking Tools are being used on a particular webpage.

113. Together, these Tracking Tools enable Yale New Haven to optimize the delivery of ads, measure cross-device conversions, create custom audiences and reduce advertising and marketing costs.

114. However, Yale New Haven's Website does not rely on Tracking Tools in order to function.

115. While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Yale New Haven via its Website.

116. Yale New Haven did not disclose to Plaintiff and Class Members that their Private Information would be shared with third parties as it was communicated to Defendant.

117. Plaintiff and Class Members never consented, agreed, authorized or otherwise permitted Yale New Haven to disclose their Private Information to third parties, nor did they intend for third parties to be a party to their communications with Defendant.

118. Yale New Haven's Tracking Tools sent non-public Private Information to third parties, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) sought treatment or therapies; (iv) appointment requests and appointment booking information; (v) locations or facilities where treatment is sought; (vi) which web pages were viewed and (vii) phrases and search queries conducted via the general search bar.

119. Importantly, the Private Information Defendant's Tracking Tools was sent alongside unique identifiers assigned to Plaintiff's and Class Members' devices or browsers, including, but not limited to, IP addresses, Google cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, The Trade Desk cookies such as TDID, StackAdapt cookies such as sa-user-id, and Adobe cookies such as ECID, thereby allowing individual patients' communications with Defendant, and the Private Information contained in

those communications, to be linked to their unique identity.

120.    Defendant knowingly and intentionally deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented technology (*i.e.*, the Tracking Tools) that surreptitiously tracked, recorded and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information unauthorized third parties and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

121.    Plaintiff never consented, agreed, authorized or otherwise permitted Defendant to disclose his PII and PHI nor did he authorize any assistance with intercepting his communications.

122.    Plaintiff was never provided with written notice that Yale New Haven disclosed its Website Users' PHI or provided any means of opting out of such disclosures.

123.    Despite this, Yale New Haven knowingly and intentionally disclosed Plaintiff's PHI to third parties including but not limited to Google.

124.    By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.

125.    Yale New Haven deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented a system that surreptitiously tracked, recorded and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information and protected health information to a third party and (ii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

I.    **Defendant's Privacy Policy and Promises**

126.    When users land on Defendant's Website, they are presented with a cookie banner that states: "We use cookies and similar technologies to make our site work. We also use optional

31

cookies to measure our site's performance, personalize content, assist in our marketing efforts and provide you with the best experience. You can click on 'Manage Cookies' to disable these optional cookies. By using our site, you agree to our Website Privacy Policy."

127.    The presentation of this Cookie Banner creates the misleading impression that cookies are used solely to improve the Website's functionality and personalize the Website's own marketing efforts. It fails to disclose that, in practice, users' sensitive health information is shared with third-party advertising and analytics providers, who use this data to monetize user behavior and enhance their cross-site targeting and advertising operations.

128.    During the statutory period, Yale New Haven's Notice Of Privacy Policies represented that any use or disclosure not covered elsewhere requires written authorization.[27] Yet the Notice does not disclose that health-related data is nonetheless shared with third-party advertising and analytics providers, creating a clear inconsistency between what the policy states and what occurs in practice.[28]

129.    Defendant's Online Privacy Policy disclosures further represent that information shared for advertising purposes is limited in scope and does not include identifying or health information. Specifically, Defendant states: "For advertising. Using cookies and web beacons, we may disclose Personal Information regarding your activity on our Websites to our advertising partners to optimize marketing."[29] The policy further assures users that "[t]he Personal Information we share for this purpose is limited to IP address, device ID, and online identifier. We do not share identifying information such as names, email addresses, phone numbers, or any health

---

[27] *See* Yale New Haven Health Sys., Notice of Privacy Practices, https://www.ynhhs.org/policies (last visited Mar. 8, 2026).

[28] *Id*.

[29] Yale New Haven Health Sys., Online Privacy Policy, https://www.ynhhs.org/policies/online-privacy (last visited Mar. 8, 2026).

information."[30]

130.    The Online Privacy Policy also acknowledges that Defendant uses "cookies, tracking technologies, and analytics" on its websites and that such tools may be used to "tailor digital advertisements on third-party websites based on your interactions on our Sites." These disclosures present the use of tracking technologies as limited to analytics and advertising optimization while assuring users that health information and identifying personal data are not shared with advertising partners.

131.    These statements are materially misleading in light of Defendant's actual website practices. As set forth herein, Defendant's websites deploy third-party tracking technologies that intercept users' interactions with the website, including pages visited, search parameters, and communications entered into website forms. Those interactions are transmitted together with persistent identifiers such as IP addresses, cookies, and device identifiers to third-party analytics and advertising platforms including, but not limited to, Google, The Trade Desk, StackAdapt, and Adobe.

132.    Defendant's privacy disclosures do not adequately inform patients that their interactions with healthcare provider pages, appointment scheduling tools, or other health-related webpages may be transmitted to third-party advertising and analytics companies through tracking technologies embedded on the website. A reasonable user reviewing Defendant's policies would understand that health-related information is not shared with advertising partners and that any marketing-related disclosures are limited to basic technical identifiers.

133.    By intercepting and transmitting Plaintiff's and Class Members' interactions together with unique identifiers to third-parties, Defendant disclosed information beyond what its

---

[30] *Id.*

privacy disclosures represented. These transmissions occurred without obtaining the written authorization or informed consent that Defendant's own privacy materials represent is required for marketing uses or disclosures of their Private Information.

**J.      Federal Warning on Tracking Codes on Healthcare Websites**

130.    Beyond Defendant's own policies, the federal government has issued guidance warning that tracking code like the Tracking Tools employed by the Defendant may come up against federal privacy law when installed on healthcare websites.

131.    The OCR Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as the Defendant's Tracking Tools, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' protected health information to these vendors. [31]

132.    The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[32]

133.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist***

---

[31]      *See Use of Online Tracking Technologies by HIPAA*, *supra*, note 3.

[32]      *Id.* (emphasis added).

*or other health care professionals, and where an individual seeks medical treatment.* While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*[33]

134. Plaintiff and Class Members face just the risks about which the government expresses concern. Defendant has passed along Plaintiff's and Class Members' search terms about health conditions for which they seek doctors; their contacting of doctors to make appointments; the names of their doctors; the frequency with which they take steps relating to obtaining healthcare for certain conditions and where they seek medical treatment.

135. This information is, as described by the OCR Bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, *or any unique identifying code.*[34]

136. Crucially, that paragraph in the government's Bulletin continues:

> IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services… [for example,] if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, *the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the*

---

[33]   *Id.* (emphasis added).

[34]   *Id.* (emphasis added).

> *information is both identifiable and related to the individual's health or future health care.*[35]

137.    The OCR Bulletin reminds healthcare organizations regulated under the HIPAA that they may use third-party tracking tools, such as the Google Tracking Tools, only in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[36]

138.    The federal government is taking these violations of health data privacy and security seriously, as recent high-profile FTC settlements against several telehealth companies demonstrate.

139.    For example, in 2021 and 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook and Google. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[37]

---

[35]    *Id.* (emphasis added).

[36]    *See id.*

[37] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising, Fed. Trade Comm'n* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, Fed. Trade Comm'n (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-

140.    Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[38]

141.    This is further evidence that the data that Defendant chose to disclose is protected Private Information, and the disclosure of that information was a violation of Plaintiff's and Class Members' rights.

**K.    Yale New Haven's Use of Tracking Technologies Violated HIPAA.**

142.    Yale New Haven's disclosure of Plaintiff's and Class Members' Private Information to entities like Google also violated HIPAA.

143.    Under federal law, a healthcare provider may not disclose PII, non-public medical

---

banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, Fed. Trade Comm'n (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, Fed. Trade Comm'n (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.);    (last visited Mar. 8, 2026).

[38] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.

information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[39]

144.   HHS instructs healthcare providers that patient status itself is protected by HIPAA.

145.   HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

146.   The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

147.   Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A.   Names;
…
H.   Medical record numbers;
…
J.   Account numbers;
…

_____

[39] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

M.      Device identifiers and serial numbers;
N.      Web Universal Resource Locators (URLs);
O.      Internet Protocol (IP) address numbers; … and
P.      Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[40]

148.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers like Defendant—to maintain appropriate safeguards to protect the privacy of PHI. The Privacy Rule also sets limits and conditions on the uses and disclosures of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

149.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, is considered PHI.

150.    HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[41]

151.    Consistent with this restriction, HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or

---

[40] *See* 45 C.F.R. § 160.514.

[41] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,* U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited Mar. 8, 2026).

any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[42]

152.    Here, as described *supra*, Yale New Haven provided patient information to third parties in violation of the Privacy Rule—and its own Privacy Policy. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320(d)(6).

153.    The statute states that a "person …  shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

154.    Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm."  42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

155.    HIPAA also requires Yale New Haven to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical

---

[42]    *Marketing*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 8, 2026).

policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Yale New Haven failed to do.

156. Under HIPAA, Yale New Haven is forbidden to disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

157. Yale New Haven further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PHI that Yale New Haven created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c) Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Yale New Haven in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d) Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e) Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3), and

f) Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

158. In disclosing the content of Plaintiff and the Class Members' communications, Yale

New Haven had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions.

159. Yale New Haven's placement of third-party Tracking Tools on its Website is a violation of Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Yale New Haven's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**L.     Plaintiff's and Class Members' Private Information Has Substantial Financial Value.**

160. Plaintiff and Class Members' Private Information has substantial value. Yale New Haven's disclosure and interception harmed Plaintiff and the Class Members by not compensating them for the value of their Private Information and diminishing the value of their Private Information.

161. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

162. Courts recognize the value of personal information and the harm when it is disclosed without consent. *See, e.g., In re Lurie Children's Hosp. Data Sec. Litig.*, No. 24-CV-05503, 2025 WL 2754760, at *1 (N.D. Ill. Sept. 27, 2025) (recognizing that disclosure of private medical information, including diagnoses and treatment information, constitutes a concrete and cognizable harm); *Smith v. Loyola Univ. Med. Ctr.*, No. 23-CV-15828, 2024 WL 3338941, at *6–*7 (N.D. Ill. July 9, 2024) (holding that plaintiffs plausibly alleged injury based on the unauthorized disclosure of sensitive health-related information through tracking pixels and recognizing disclosure of private medical information as a traditionally cognizable harm).

163. Healthcare data is particularly valuable on the black market because it often

contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

164.    Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, the damage caused can be irreparable.

165.    The value of health data is well-known, and various reports have been conducted to identify its value.

166.    Specifically, in 2023, the Value Examiner published a report titled "Valuing Healthcare Data." The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[43]

167.    Trustwave Global Security published a report entitled "The Value of Data." With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next-highest-value record (a payment card).[44]

168.    The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[45]

---

[43] *See    Valuing    Healthcare    Data* (white    paper),    Health    Capital    (Dec. 2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcar e%20Data.pdf.

[44]    *See    Healthcare    Data:    The    New    Prize    for    Hackers*,    Imprivata    (Nov.    30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

[45] *See* Alice Park & Brian Everstine, *How the Medical-Data Industry Sells Your Records — and Why Doctors Can't Stop It*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

169.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[46]

170.    The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold evidences the value of PHI.

171.    These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

172.    Google's and others' practices of using such information to package groups of people as "Lookalike Audiences"[47] and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

173.    Data harvesting is the fastest growing industry in the nation.

174.    As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

175.    Consumer data is so valuable that some have proclaimed that data is the new oil.

176.    Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

177.     Overall, the value internet companies derive from Americans' personal data increased almost 54% and is only expected to continue growing in the coming years.

---

[46] *See* Lauren Hirsch, *Hospital Execs Say They're Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[47] *Lookalike audiences*, Display & Video 360 Help, https://support.google.com/displayvideo/answer/15612398?hl=en (last visited Mar. 8, 2026) ("Lookalike audiences are groups of people that share characteristics with others on an existing 'seed' list … find other potential customers with similar characteristics").

178.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user. By 2020, that value had jumped to approximately $420 per adult American user each year, making personal data sales a nearly $140 million industry.[48]

179.    In 2025, the global big data market was projected to be valued at approximately $224.46 billion.[49]

180.    As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/ ) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3 ) are becoming commonplace).[50]

181.    Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."

---

[48] Pawtocol, *How Much Is User Data Worth?*, Medium (Mar. 16, 2020), https://pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136.

[49] Market Data Forecast, *Big Data Market Size, Share, Trends & Analysis, 2033* (Sept. 25, 2025), https://www.marketdataforecast.com/market-reports/big-data-market (projecting the global big data market to grow from a 2024 value of USD 199.63 billion to an estimated USD 224.46 billion in 2025).

[50]    *See* Iris Kulbatski, *The Dangers of Electronic Health Records*, National Post (Feb. 26, 2020), https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records.

\* \* \*

> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[51]

182. The CNBC article also explained:

> De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

183. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with particular health conditions. Policymakers are proactively calling for a revision and potential upgrade of the health privacy rules known as HIPAA, out of concern for what might happen as tech companies continue to march into the medical sector.[52]

184. Time Magazine similarly, in an article titled, *How your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized

---

[51]    *See* Lauren Hirsch, *Hospital Execs Say They're Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[52]    *Id.*

patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[53]

185.    This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[54]

186.    There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

187.    In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

188.    Yale New Haven gave away Plaintiff's and Class Members' communications and transactions on its Website without permission.

189.    The unauthorized access to Plaintiff's and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users, including Plaintiff and Class Members.

190.    Plaintiff has a continuing interest in ensuring that his future communications with Yale New Haven are protected and safeguarded from future unauthorized disclosure.

---

[53]    *See* Alice Park & Brian Everstine, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

[54] *See 10 Apps for Selling Your Data for Cash,* WalletHacks, https://wallethacks.com/apps-for-selling-your-data/ (last visited Mar. 8, 2026).

**M.     Defendant Violated Industry Standards.**

191.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship, it is a cardinal rule.

192.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

193.    AMA Code of Ethics Opinion 3.1.1 provides that "[p]rotecting information gathered in association with the care of the patient is a core value in health care…. Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

194.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

195.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[55]

---

[55] Am. Med. Ass'n, *Code of Medical Ethics ch. 3*, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited Mar. 8, 2026).

N.      **Users' Reasonable Expectation of Privacy**

196.    Plaintiff and Class Members were aware of Yale New Haven's duty and assurances of confidentiality when they sought medical services from Defendant.

197.    Indeed, when Plaintiff and Class Members provided their PII/PHI to Yale New Haven, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

198.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

199.    For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[56]

200.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

201.    Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Yale New Haven's status as a healthcare provider, Defendant's obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use

---

[56] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

and disclosure of personal means of identification, and Defendant's express promises of confidentiality.

**O.    Unique Personal Identifiers, including IP Addresses, are Protected Health Information.**

202.    While not all entities are covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers and healthcare data clearinghouses.[57]

203.    The HIPAA Privacy Rule sets forth policies to protect all individually identifiable health information that is held or transmitted.

204.    HIPAA identifies at least 18 categories of identifiers that render health information individually identifiable when maintained by or disclosed from a covered entity. Such identifiers constitute protected health information when they identify an individual or when the covered entity has actual knowledge that the information can be used alone or in combination with other information to identify an individual. *See* 45 C.F.R. § 164.514(b)(2)(i).

205.    These HIPAA Identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[58]

206.    Yale New Haven unlawfully disclosed Plaintiff's and Class Members' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device identifiers and web URLs visited to third parties through their use of the Tracking Tools *in*

---

[57] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook*, The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations").

[58] U.S. Dep't of Health & Hum. Servs., *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 8, 2026).

*addition to* services selected, patient statuses, medical conditions, treatments, provider information and appointment information.

207.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

208.    In addition to patient status, medical conditions, treatment, specific providers, and appointment information, Yale New Haven improperly disclosed patients' computer IP addresses to third parties like Google through the use of Tracking Tools.

209.    An IP address is a number that identifies the address of a device connected to the Internet.

210.    IP addresses are used to identify and route communications on the Internet.

211.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

212.    Under HIPAA, an IP address is considered personally identifiable information.

213.    HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

214.    Consequently, Yale New Haven's disclosure of patients' IP addresses violated HIPAA and industry-wide privacy standards.

215.    In addition to the substantive health-related information described above, Yale New Haven disclosed to Google and other third parties a series of *unique identifying codes* associated with Plaintiff's and Class Members' website interactions, including persistent cookie identifiers,

51

device identifiers, and other tracking IDs assigned by Google and Microsoft's tracking technologies.

216. These unique identifying codes include, among others, Google advertising and analytics cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, The Trade Desk cookies such as TDID, StackAdapt cookies such as the StackAdapt Pixel, and Adobe tools and cookies such as the Adobe Experience Platform Edge Network and ECID, which function as persistent identifiers that allow these third party vendors to distinguish, recognize, and track a specific individual or device across browsing sessions and across websites.

217. Under HIPAA, "individually identifiable health information" expressly includes not only traditional identifiers like names or medical record numbers, but also "any other unique identifying number, characteristic, or code" that can be used to identify an individual or for which there is a reasonable basis to believe the information can be used to identify the individual. 45 C.F.R. § 160.103; 45 C.F.R. § 164.514(b)(2)(i).

218. HIPAA's de-identification rule makes clear that information is *not* de-identified if it includes device identifiers, IP addresses, URLs, or other unique identifying codes, or if the covered entity has actual knowledge that the information could be used—alone or in combination with other information—to identify an individual. 45 C.F.R. § 164.514(b)(2).

219. Yale New Haven knowingly disclosed these unique identifying codes alongside URLs, page content, search terms, and other communications that directly reflect an individual's interest in, pursuit of, or receipt of healthcare services, thereby allowing third parties to link those health-related communications to a specific, identifiable patient.

220. Because these unique identifying codes were transmitted together with information

relating to an individual's health conditions, providers, appointments, or treatment inquiries, they constitute individually identifiable health information—and therefore protected health information—under HIPAA.

221. Yale New Haven's disclosure of these unique identifying codes to third parties was not incidental, anonymous, or de-identified, but instead enabled ongoing recognition, profiling, and re-identification of Plaintiff and Class Members in connection with their healthcare activities, in direct contravention of HIPAA's privacy and de-identification requirements.

**P.    Defendant was Enriched and Benefitted from the Use of Tracking Tools and Unauthorized Disclosures.**

222. The sole purpose of the use of the Tracking Tools on Yale New Haven's Website was marketing and profits.

223. In exchange for disclosing the Personal Information of its patients, Yale New Haven is compensated by third party vendors like Google in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

224. After receiving individually identifiable patient health information communicated on Yale New Haven Website, third party vendors forward this data, and its analysis of this data, to Defendant.

225. Yale New Haven then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

226. Yale New Haven also receives an additional commercial benefit from using third party Tracking Tools, such as the Google DoubleClick, namely being able to serve more targeted advertisements to existing and prospective patients on their Google accounts.

227. Google advertises its Tracking Tools as follows: "when you visit a website that uses [our] advertising services … your web browser automatically sends certain information to Google.

53

This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there."[59]

228. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking technology placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[60]

229. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a healthcare website back to Google via the Tracking Technologies and the tag embedded on, in this case, Yale New Haven's Website. For example, when a User searches for doctors, medical conditions or treatment on Yale New Haven's Website, that information is sent to Google Ads via the conversion tracking tag and associated cookies. Google can then use its data on the User to find more users to click on a Yale New Haven ad and ensure that those users targeted are more likely to convert.[61]

230. Through this process, the Google Tracking Tools embedded on Yale New Haven's Website record and transmit information about a User's activity when the User loads and interacts with the Website. As Google explains, when a User completes or triggers a defined action on a

---

[59] *How Google uses information from sites or apps that use our services*, Privacy & Terms, *https://policies.google.com/technologies/partner-sites* (last visited Mar. 8, 2026).

[60] The Complex World of Healthcare Retargeting, Medico Digital (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/. (last visited Mar. 8, 2026)

[61] *See,* WordStream, *How Does Google Remarketing Work?* (explaining that placing Google remarketing code or tag on a website allows advertisers to add visitors to remarketing audiences via browser cookies and then serve targeted Google Ads to those visitors as they browse other sites to increase conversions), https://www.wordstream.com/google-remarketing (last visited Mar. 8, 2026).

website, the Google tag or conversion tracking code reads existing cookies and sends information about the page visited and the action taken back to Google for advertising and measurement purposes. The data transmitted includes the URLs of pages visited and the specific actions taken on the website, which, in the healthcare context, may reflect an individual's interest in or pursuit of medical services.[62]

231.    Plaintiff's and Class Members' Private Information have considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

## REPRESENTATIVE PLAINTIFF JAMES WILLIAMS EXPERIENCES

232.    As a condition of receiving Yale New Haven's services, Plaintiff James Williams disclosed Private Information to Yale New Haven on numerous occasions, most recently in 2026.

233.    Plaintiff accessed Yale New Haven's Website on his phone and laptop to receive healthcare services from Defendant and at Defendant's direction.

234.    During the relevant time period, when the Defendant's Tracking Tools were present, Plaintiff used Yale New Haven's website, https://www.ynhhs.org/, to schedule appointments, request information on specific medical services, research providers, review financial assistance resources, and login to MyChart. The full scope of Yale New Haven's interceptions and disclosures of Plaintiff's communications to third parties including but not limited to Google and can only be determined through formal discovery. However, Yale New Haven intercepted at least the following communications about Plaintiff's prospective healthcare. The following long-URLs or substantially similar URLs were sent to third parties via Tracking Tools:

---

[62] *Id.*

- https://mychart.ynhhs.org/MyChart-PRD/Authentication/Login?
- https://www.ynhh.org/find-a-doctor
- https://www.ynhh.org/find-a-doctor#q=ear%20nose%20and%20throat&sort=relevancy&f:affiliations=[YaleMedNortheast]&f:deliverynetwork=[Yale%20New%20Haven%20Hospital]
- https://googleads.g.doubleclick.net/pagead/viewthroughconversion/803599077/?random=2059536251&cv=11&fst=1772643155403&bg=ffffff&guid=ON&async=1&en=conversion&gtm=45be6321v895440896za200zd895440896xec&gcd=13l3l3l3l1l11&dma=0&tag_exp=103116026~103200004~115938465~115938469~116024733~117484252~117755070&u_w=1440&u_h=900&url=https%3A%2F%2Fwww.ynhh.org%2Fphysicians%2Fmark-bianchi&ref=https%3A%2F%2Fwww.ynhh.org%2Ffind-a-doctor&label=IAKlCMjqxq4DEOXll_8C&capi=1&gtm_ee=1&frm=0&tiba=Mark%20Bianchi%2C%20MD%20Otolaryngology%20%7C%20Bridgeport%20Hospital&hn=www.googleadservices.com&npa=0&pscdl=noapi&auid=852861849.1772642742&uaa=x86&uab=64&uafvl=Not%253AA-Brand%3B99.0.0.0%7CGoogle%2520Chrome%3B145.0.7632.117%7CChromium%3B145.0.7632.117&uamb=0&uam=&uap=macOS&uapv=14.8.3&uaw=0&_tu=IA&gcl_ctr=5~0~0&data=event%3Dconversion&category=acrcp_v1_512&fmt=3&ct_cookie_present=false&crd=CLTesQIIobixAgixwbECCLDBsQIIscOxAgiKxbECCMLJsQIItMaxAgjb3LECCIfbsQII08WxAgjrzLECCO3OsQII1c-xAgj02rECCJfUsQIIyduxAgiw4bECShR0cmlnZ2VyO2V2ZW50LXNvdXJjZVoDCgEBYgMKAQM&cerd=CgEA&fsk=ChEIgM2fzQYQ8cLOs6TSy-vbARIsAN8kMM0eRQSOySFicvTU16i74bKKUYGRXnMapono__NKe5anH34APBv2wJMaAknm&pscrd=IhMI9dPirNqGkwMVj-r1Ah0bBSvgMgwIA2IICAAQABgAIAAyDAgEYggIABAAGAAgADIMCAdiCAgAEAAYACAAMgwICGIICAAQABgAIAAyDAgJYggIABAAGAAgADIMCApiCAgAEAAYACAAMgwIAmIICAAQABgAIAAyDAgLYggIABAAGAAgADIMCBViCAgAEAAYACAAMgwIH2IICAAQABgAIAAyDAgTYggIABAAGAAgADIMCBJiCAgAEAAYACAAOhVodHRwczovL3d3dy55bmhoLm9yZy9CV0NoRUlnTTJmelFZUNk15ZnVPNFBBpZEFSSXNBSZROUdER1hGY1R2cEVVqN1VzM2NXRjFWRzNuuMWVHYnnRKR2o4OWdGUldkPRlkwWUxCX1hENlo5cXBuQXoMCAliCAgAEAAYACAA
- https://www.ynhh.org/search#q=urgent%20care&t=all&sort=relevancy
- https://www.ynhh.org/locations/stratford-1040-barnum-ave-urgent-care
- https://www.solvhealth.com/r/book-online/plDOdp/CORE5io6NkQjnFkV2uXwE/slots/today
- https://googleads.g.doubleclick.net/pagead/viewthroughconversion/976217858/?random=1772645001168&cv=11&fst=1772645001168&bg=ffffff&guid=ON&async=1&en=form_submit&gtm=45be6321v9189882162za200zb894094632zd894094632xec&gcd=13l3l3l3l1l11&dma=0&tag_exp=103116026~103200004~115938466~115938469~116024733~117484252&u_w=1440&u_h=900&url=https%3A%2F%2Fwww.solvhealth.com%2Fr%2Fbook-online%2FplDOdp%2Fm1qkrBNpYh_jwQaPxsM8K%2Ffind-account%3Fvariant%3Dbooking_widget&frm=0&tiba=Yale%20New%20Haven%20Health%20Urgent%20Care%2C%20Stratford%20-

56

%20Book%20Online%20-
%20Urgent%20Care%20in%20Stratford%2C%20CT%2006614%20%7C%20Sol
v&hn=www.googleadservices.com&npa=0&pscdl=noapi&auid=2043868752.177
2644919&uaa=x86&uab=64&uafvl=Not%253AA-
Brand%3B99.0.0.0%7CGoogle%2520Chrome%3B145.0.7632.117%7CChromiu
m%3B145.0.7632.117&uamb=0&uam=&uap=macOS&uapv=14.8.3&uaw=0&da
ta=event%3Dform_submit&rfmt=3&fmt=4

- https://www.ynhhs.org/find-a-
  doctor#sort=relevancy&f:affiliations=[YaleMedNortheast]&f:geolocation=[41.20
  6456,-73.171486]&f:location=06610
- https://www.ynhhs.org/get-care-now
- https://www.ynhhs.org/find-a-location#sort=relevancy&numberOfResults=25
- https://www.ynhhs.org/find-a-
  location#q=smilow%20cancer%20center&sort=relevancy&numberOfResults=25
- https://www.ynhhs.org/locations/trumbull-5520-park-avenue-smilow-cancer-care
- https://www.ynhhs.org/patient-care/billing-insurance/Financial-assistance
- https://www.ynhhs.org/-/media/Files/YNHHS/financial-assistance-
  policy/2025/6304/F6304_FAP_Plain_Language_Summary_and_Application_040
  125.ashx

235. Contemporaneously with its interception and transmission of Plaintiff's communications on https://www.ynhhs.org/, Yale New Haven also disclosed to third parties Plaintiff's personal identifiers, including but not limited to his IP addresses, cookie identifiers, device identifiers and account numbers.

236. Yale New Haven never notified Plaintiff that it and third parties would put individually identifiable patient health information about his past, present, or future health conditions to their own commercial uses. Plaintiff never provided informed consent or written permission allowing Yale New Haven to send individually identifiable patient health information about his past, present, or future health conditions to third parties. Plaintiff never provided informed consent or written permission allowing Yale New Haven or any third party to put individually identifiable patient health information about his past, present, or future health conditions to their own commercial use.

57

237.    After using Yale New Haven's Website and communicating his Private Information, Plaintiff received advertisements for Yale New Haven's services on YouTube. Plaintiff did not consent to Yale New Haven's use or disclosure of his Private Information for advertising or marketing purposes.

238.    Google, The Trade Desk, StackAdapt, and Adobe log and maintain records of the advertisements they serve to individual users and their devices. Plaintiff will seek in discovery the records reflecting the ads related to his medical conditions and treatments that were delivered to him and the Class Members, along with associated targeting and delivery data, to fully inform the scope of his claims and damages and the ways in which their Private Information was used for advertising.

239.    Plaintiff provided Private Information to Yale New Haven and trusted that the information would be safeguarded according to Yale New Haven's policies and state and federal law.

240.    Plaintiff reasonably expected that his communications with Defendant via the Website were confidential, solely between himself and Yale New Haven, and that such communications would not be transmitted to or intercepted by a third party.

241.    By doing so without his consent, Yale New Haven breached its Notice of Privacy Practices and Online Privacy Policy and unlawfully disclosed his Private Information.

242.    Plaintiff Williams suffered damages in form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages and (iv) the continued and ongoing risk to his Private Information.

243.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Yale New Haven's possession, is protected and

safeguarded from future unauthorized disclosure.

## TOLLING

244. Any statute of limitations applicable to Plaintiff's claims has been tolled by Yale New Haven's actual knowledge and efforts to conceal the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and the Class Members had no obvious way to discover Yale New Haven's deception and unlawful conduct.

245. Plaintiff and the Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Yale New Haven was acting unlawfully. The earliest Plaintiff or a reasonable user of Yale New Haven's Website could have learned of Yale New Haven's conduct was approximately January 2026, when Plaintiff's counsel, through an independent technical investigation, identified Tracking Tools operating on Yale New Haven's Website and transmitting user healthcare communications and identifiers to third parties. Yale New Haven's alleged representations were material to Plaintiff and the Class Members at all relevant times. Before the expiration of any applicable statute of limitations period, Plaintiff and the Class Members could not have discovered Defendant's wrongful conduct through the exercise of reasonable diligence because Yale New Haven's incorporation of the Tracking Tools is highly technical, undiscoverable by ordinary users of Yale New Haven's Website, and Defendant made no disclosures or other indications that would inform a reasonable user of its Website that Yale New Haven was intercepting and disclosing Users' individually-identifiable health information to third parties.

246. At all relevant times, Yale New Haven was—and still is—under a continuous duty to disclose to Plaintiff and the Class Members the true nature of the disclosures being made and the lack of an actual "requirement" before it shares Plaintiff's and the Class Members' data with third parties, including but not limited to, Google, The Trade Desk, StackAdapt, and Adobe.

247.    Yale New Haven's knowingly, actively, affirmatively or negligently concealed the facts alleged herein.

248.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Yale New Haven's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

249.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated (the "Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

250.    The Class that Plaintiff seeks to represent is defined as follows:

> All people who used Yale New Haven's Website and had individually-identifiable patient health information about their past, present, or future health conditions shared with third parties without notice or consent.

251.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries; any entity in which Defendant has a controlling interest; any Defendant officer or director, any successor or assign; Defendant's and Plaintiff's attorneys in this action, their staff and immediate family; and any Judge who adjudicates this case, including their staff and immediate family.

252.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

253.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(1), because the Class Members are so numerous and geographically dispersed that their joinder would be impracticable. Plaintiff believes that Yale New Haven, Google, The Trade Desk, StackAdapt and Adobe's business records will permit the identification of thousands of people meeting the Class definition.

254. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class Members, including:

a. Whether Yale New Haven had a duty to protect and refrain from disclosing the Class Members' individually identifiable health information;

b. Whether Yale New Haven intentionally disclosed the Class Members' individually identifiable health information to third parties including but not limited to Google;

c. Whether the Class Members consented to Yale New Haven disclosure of their individually identifiable health information to third parties, including but not limited to Google;

d. Whether the Class Members are entitled to damages because of Yale New Haven's conduct; and

e. Whether Yale New Haven's knowing disclosure of its patients' individually identifiable health information to third parties, including but not limited to Google is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

255. Plaintiff also anticipates that Defendant will raise defenses common to the Class.

256. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(3), because Plaintiff's claims are typical of the claims belonging to the Class Members. Plaintiff and the Class Members were harmed by the same wrongful conduct perpetrated by Yale New Haven that caused their individually identifiable health information to be intercepted and disclosed without notice or consent. As a result, Plaintiff's claims are based on the same facts and legal theories as the Class Members' claims.

257. This action is properly maintained as a class action under Fed. R. Civ. P. 23(a)(4), because Plaintiff will fairly and adequately protect the interests of all the Class Members, there are no known conflicts of interest between Plaintiff and the Class Members, and Plaintiff has retained counsel experienced in the prosecution of complex litigation.

258.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class Members, because a class action is superior to other available methods for the fair and efficient adjudication of these claims and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class Members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class Members' ability to protect their interests.

259.     The State of Connecticut has a significant interest in regulating the conduct of businesses operating within its borders.

260.     Connecticut, which seeks to protect the rights and interests of Connecticut and all residents and citizens of the United States against a company headquartered and doing business in Connecticut, has a greater interest in the claims of Plaintiff and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

261.     The principal place of business and headquarters of Yale New Haven, located in Connecticut, is the "nerve center" of its business activities—the place where its high-level officers direct, control and coordinate its activities, including major policy, financial and legal decisions.

262.     Upon information and good faith belief, Yale New Haven's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in Connecticut.

263.     Yale New Haven's breaches of duty to Plaintiff and Class Members emanated from Connecticut.

264.     Application of Connecticut law to the Class with respect to Plaintiff's and the Class Members' common law claims is neither arbitrary nor fundamentally unfair because, further to choice of law principles applicable to this action, the common law of Connecticut applies to the

nationwide common law claims of all Class Members. Additionally, given Connecticut's significant interest in regulating the conduct of businesses operating within its borders, and that Connecticut has the most significant relationship to Yale New Haven, as it is headquartered in Connecticut, there is no conflict in applying Connecticut law to non-resident consumers such as Plaintiff and Class Members. Alternatively, and/or in addition to Connecticut law, the laws set forth below apply to the conduct described herein.

## COUNT I
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
### 18 U.S.C. § 2510, *et seq.*

265.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

266.    The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

267.    The ECPA protects both the sending and receipt of communications.

268.    The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. 18 U.S.C. § 2520(a).

269.    Yale New Haven intentionally intercepted electronic communications that Plaintiff and the Class Members exchanged with Defendant through Tracking Tools installed on Yale New Haven's Website.

270.    The transmissions of data between Plaintiff and the Class Members and Yale New Haven qualify as communications under the ECPA. 18 U.S.C. § 2510(12).

271.    Yale New Haven contemporaneously intercepted and transmitted Plaintiff's and the Class Members' communications to third parties, including but not limited to Google, The Trade Desk, StackAdapt, and Adobe.

272.   The intercepted communications include:

a.   The content of Plaintiff's and the Class Members' communications relating to appointments with medical providers;

b.   The content of Plaintiff's and the Class Members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

c.   Button/menu selections and/or content typed into free text boxes; and

d.   Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

273.   The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.   The cookies Yale New Haven and third parties, including but not limited to, Google, use to track Plaintiff's and the Class Members' communications;

b.   Plaintiff's and the Class Members' browsers;

c.   Plaintiff's and the Class Members' computing devices, including desktop computers, laptop computers, tablets and smartphones;

d.   Yale New Haven's web-servers or webpages where Tracking Tools are present;

e.   Google, The Trade Desk, StackAdapt and Adobe's web-servers; and;

f.   The Google, The Trade Desk, StackAdapt, and Adobe's advertising and analytics scripts embedded in Yale New Haven's Website, which intercept and transmit Plaintiff's and the Class Members' communications to third parties.

274.   Google, The Trade Desk, StackAdapt, Adobe and other third parties are not parties to Plaintiff's and the Class Members' communications with Yale New Haven.

64

275. Yale New Haven transmits the content of Plaintiff's and the Class Members' communications to third parties, including but not limited to, Google, The Trade Desk, StackAdapt, and Adobe, through the surreptitious redirection of those communications from Plaintiff's and the Class Members' computing devices.

276. Plaintiff and the Class Members did not consent to third parties' acquisition of their appointment and treatment communications with Yale New Haven.

277. Third parties like Google did not obtain legal authorization to obtain Plaintiff's and the Class Members' communications with Yale New Haven relating to communications with their health entities.

278. Google, The Trade Desk, StackAdapt, and Adobe did not require Yale New Haven to obtain the lawful rights to share the content of Plaintiff's and the Class Members' communications relating to appointments and treatments.

279. Any purported consent that Google, The Trade Desk, StackAdapt, and Adobe received from Yale New Haven to obtain the content of Plaintiff's and the Class Members' communications was not valid.

280. In disclosing the content of Plaintiff's and the Class Members' communications relating to treatments, conditions and appointments, Yale New Haven had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions, as follows:

    a. The unauthorized disclosure of individually identifiable health information is tortuous in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use for the acquisition. Yale New Haven intentionally committed a tortuous act by disclosing individually identifiable health information without authorization to do so.

    b. The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6,

65

regardless of any subsequent purpose or use of the individually identifiable health information. Yale New Haven intentionally violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

c.  A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, is a crime punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." Yale New Haven intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by disclosing the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

d.  Trespass upon Plaintiff's and the Class Members' personal and private property via the placement of the Tracking Tools on Plaintiff's and the Class Members' personal computing devices is tortious.

e.  Violation of 18 U.S.C. §§ 1343 (fraud by wire, radio, or television) and 1349 (attempt and conspiracy)—which prohibit a person from "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate … commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice"—is a federal crime.

f.  Yale New Haven's affirmative misrepresentations to Users through its cookie banner, which falsely assured Users that cookies were not used for tracking purposes despite the simultaneous deployment of multiple third-party tracking technologies, further evidencing Yale New Haven's intent to conceal its unauthorized disclosures and to deprive Users of the opportunity to make informed decisions regarding their Private Information.

281.  The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the defendant did so with the intent to defraud; (3) that is was reasonably

foreseeable that interstate wire communications would be used; and (4) that interstate wire communications were in fact used. The attempt version of the wire fraud statute provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349.

282.   Any "party" exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in Section 2511(2)(d) does not permit a party to escape liability if a communication is intercepted for the purpose of committing any tortious or criminal act. Here, as alleged above, Yale New Haven violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information to a third party. The "party" exception therefore does not apply.[63]

283.   Plaintiff's and Class Members' information that Yale New Haven disclosed to third parties qualifies as individually identifiable health information, and Defendant violated Plaintiff's expectations of privacy, which constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Yale New Haven intentionally used the wire or electronic communications to increase its profit margins. Yale New Haven specifically used the Tracking Tools and other codes to track and utilize Plaintiff's and Class Members' Private Information for its own financial benefit.

284.   Plaintiff and Class Members did not authorize Yale New Haven to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via Tracking Tools. Plaintiff and Class Members had a reasonable expectation that Yale New

---

[63] And rightfully so. Yale New Haven, in essence, installed a wiretap on its own Website to boost its own marketing capabilities by disclosing User's Private Information to third parties, without informing those Users or obtaining their consent.

Haven would not re-direct their communications content others attached to their personal identifiers in the absence of their knowledge or consent.

285. Any purported consent that Yale New Haven received from Plaintiff and Class Members was not valid.

286. Yale New Haven's scheme or artifice to defraud in this action further consists of the false and misleading statements and omissions in its privacy policies set forth above.

287. Yale New Haven acted with the intent to defraud in that it willfully invaded Plaintiff's and the Class Members' property rights, including their:

   a. Property right to the confidentiality of their Private Information, their right to determine whether such information remains confidential and their exclusive right to determine who may collect and/or use such information for marketing purposes; and

   b. Property right to determine who has access to their computing devices.

288. Yale New Haven acted with the intent to defraud in that it willfully invaded and took Plaintiff's and the Class Members' property:

   a. With knowledge that (1) Yale New Haven did not have the right to share Private Information without written authorization; (2) courts have determined that a healthcare providers' use of similar Tracking Tools gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable user would not understand that Google and other third party vendors were collecting their Private Information based on their activities on Yale New Haven's Website; and (4) the subsequent use of health information for advertising was a further invasion of Plaintiff's and Class Members property rights to make exclusive use of their individually-identifiable health information for any purpose not related to the provision of their healthcare.

   b. With the intent to (1) acquire Plaintiff and the Class Members' individually identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; and (2) use

68

Plaintiff's and the Class Members' individually-identifiable health information without their authorization.

289. Plaintiff and the Class Members have suffered damages because of Yale New Haven's violations of the ECPA that include:

   a. Yale New Haven eroded the essential, confidential nature of the provider-patient relationship;

   b. Yale New Haven failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information;

   c. Yale New Haven derived valuable benefits from using and sharing the contents of Plaintiff's and the Class Members' communications on its Website without their knowledge or informed consent, and without providing any compensation for the information it used or shared;

   d. Yale New Haven's actions deprived Plaintiff and the Class Members of the value of their individually identifiable health information;

   e. Yale New Haven's actions diminished the value of Plaintiff's and the Class Members' property rights in their individually identifiable health information; and

   f. violating Plaintiff's and the Class Members' privacy rights by sharing their individually identifiable health information for commercial use.

290. For Yale New Haven's violations set forth above, Plaintiff and the Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Yale New Haven] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

291. Unless enjoined, Yale New Haven may continue to commit the violations of law alleged here.

69

292. Plaintiff wants to continue to communicate with his healthcare providers through online platforms but have no practical way of knowing if his communications are being intercepted and disclosed to Google and other third parties and thus continue to be at risk of harm from Defendant's conduct.

293. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class Members seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by the Plaintiff and any profits made by Yale New Haven as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## COUNT II
### NEGLIGENCE

294. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

295. Defendant owed a duty to Plaintiff and the Class Members to exercise due care in collecting, storing, safeguarding, and preventing any disclosure of their Private Information. This duty included but was not limited to: (a) preventing Plaintiff's and Class Members' Private Information from being disclosed to unauthorized third parties; and (b) destroying Plaintiff's and Class Members' Private Information within an appropriate amount of time after it was no longer required by Defendant.

296. Defendant's duties to use reasonable care arose from several sources, including those described below. Defendant had a common law duty to prevent foreseeable harm to others, including Plaintiff and Class Members, who were the foreseeable and probable victims of any data misuse, such as disclosure of Private Information to unauthorized parties.

297. Defendant had a special relationship with Plaintiff and Class Members, which is recognized by laws and regulations, including but not limited to HIPAA, as well as common law.

Defendant was in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members resulting from unauthorized disclosure of their Private Information to third parties such as Google. Plaintiff and Class Members were compelled to entrust Defendant with their Private Information. At relevant times, Plaintiff and Class Members understood that Defendant would take adequate data storage practices to safely store their Private Information. Only Defendant had the ability to protect Plaintiff's and Class Members' Private Information collected and stored on Defendant's websites.

298.    Defendant's duty to use reasonable measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of [PHI]." 45 C.F.R. § 164.530(c)(1).

299.    Yale New Haven's conduct as described above constituted an unlawful breach of their duty to exercise due care in collecting, storing, and safeguarding Plaintiff's and the Class Members' Private Information by failing to protect this information.

300.    Plaintiff and the Class Members trusted Yale New Haven and in doing so provided Defendant with their Private Information, based upon Defendant's representations that it would not use or disclose their medical information without written authorization. Defendant failed to abide by these representations.

301.    Yale New Haven breached its duty in this relationship to collect and safely store Plaintiff's and Class Members' Private Information.

302.    Plaintiff's and the Class Members' Private Information would have remained private and secure had it not been for Defendant's wrongful and negligent breach of their duties. Defendant's negligence was, at least, a substantial factor in causing Plaintiff's and Class Members'

Private Information to be improperly accessed, disclosed, and otherwise compromised, and in causing Plaintiff and the Class Members other injuries because of the unauthorized disclosures.

303. The damages suffered by Plaintiff and the Class Members were the direct and reasonably foreseeable result of Defendant's negligent breach of their duties to maintain Users' Private Information. Defendant knew or should have known that their unauthorized disclosure of highly sensitive Private Information was a breach of their duty to collect and safely store such information.

304. Defendant's negligence directly caused significant harm to Plaintiff and the Class. Specifically, Plaintiff and Class Members are now subject to their sensitive information being accessed by unauthorized parties, which may lead to significant harms.

305. Defendant had a fiduciary duty to protect the confidentiality of its communications with Plaintiff and Class Members by virtue of the explicit privacy representations Defendant made on their websites to Plaintiff and members of the Class.

306. Defendant had information relating to Plaintiff and Class Members that they knew or should have known to be confidential.

307. Plaintiff's and Class Members' communications with Defendant about sensitive Private Information and their status as patients of Defendant were not matters of general knowledge.

308. Defendant breached its fiduciary duty of confidentiality by designing their data protection systems in a way to allow for a data breach of a massive caliber.

309. At no time did Plaintiff or Class Members give informed consent to Defendant's conduct.

310.     As a direct and proximate cause of Defendant's actions, Plaintiff and Class Members suffered damage in that the information they intended to remain private is no longer so and their Private Information was disclosed to, tracked, and intercepted by third-party Internet tracking companies, including Google, without their knowledge or consent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff James Williams, on behalf of himself and all those similarly situated, respectfully pray for judgment in their favor and against Defendant Yale New Haven as follows:

- For an Order certifying this action as a class action and appointing Plaintiff as Class representative and Plaintiff's counsel as Class Counsel;

- For equitable relief enjoining Yale New Haven from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and other Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and other Class Members;

- For equitable relief compelling Yale New Haven to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Yale New Haven's wrongful conduct;

- For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined as allowable by law;

- For an award of punitive damages as allowable by law;

- For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

- Pre- and post-judgment interest on any amounts awarded; and

- All such other and further relief as this Court may deem just and proper.

73

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: March 20, 2026                    Respectfully submitted,


/s/ *James B. Zouras*
James B. Zouras (Bar No. 6230596)
Ryan F. Stephan (Bar No. 6273101)
Michael Casas (Bar No. 6343255)
**STEPHAN ZOURAS, LLC**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
Firm ID: 43734
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mcasas@stephanzouras.com


/s/ *Deborah L McKenna*
Deborah L. McKenna
**Hayber, McKenna & Dinsmore, LLC**
472 Wheelers Farms Rd, Suite 300
Milford, CT 06461
Ph: (203)691-6491
Fax: (860)218-9555
CT 17326

*Attorneys for Plaintiff and the Putative Class*

74