**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **JAMES WILLIAMS, individually and on behalf of all others similarly situated,**<br>**Plaintiff,**<br>**v.**<br><br>**YALE NEW HAVEN HEALTH SERVICES CORPORATION**<br><br>**Defendant.** | **Case No. 3:26-cv-00421-OAW** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............ ii

TABLE OF AUTHORITIES ............ iii

INTRODUCTION ............ 1

FACTS ............ 1

FEDERAL RULE 12(b)(6) STANDARD ............ 5

ARGUMENT ............ 5

I. PLAINTIFF PLAUSIBLY ALLEGES THAT YNH VIOLATED THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ............ 5

A. The One-Party Consent Rule Does Not Apply Because Plaintiff Alleges that YNH Purposely Committed a Crime or Tort ............ 6

B. Because Plaintiff Plausibly Alleges that YNH Purposefully Violated HIPAA, It Is Subject to ECPA Liability Under the Crime-Tort Exception ............ 7

C. The Plain Text of the ECPA, Along with Binding Precedent Interpreting and Legislative History, Confirm That Liability Turns on Whether the Intended Use of the Intercepted Communications Was to Commit a Criminal or Tortious Act. ............ 14

D. YNH Cannot Avoid the Crime-Tort Exception by Recasting Its Intentional, Unlawful Disclosure of PHI as Mere "Advertising" ............ 17

CONCLUSION ............ 20

**TABLE OF AUTHORITIES**


**Cases** **Page(s)**

*American Hospital Association v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) .......... 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 5

*B.N. v. Oregon Reproductive Medicine, LLC, d/b/a ORM Fertility*,
2026 WL 915343 (D. Or. April 3, 2026) .......... 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 5

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) .......... 7, 14, 15, 16

*Cohen v. Casper Sleep, Inc.*,
2018 WL 3392877 (S.D.N.Y. July 12, 2018) .......... 19

*Cooper v. Mount Sinai Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. July 30, 2024) .......... 11

*Deteresa v. Am. Broad. Cos.*,
121 F.3d 460 (9th Cir. 1997) .......... 7

*Doe v. Smith*,
429 F.3d 706 (7th Cir. 2005) .......... 20

*Faber v. Metro. Life Ins. Co.*,
648 F.3d 98 (2d Cir. 2011) .......... 5

*Gay v. Garnet Health*,
2024 WL 4203263 (S.D.N.Y. Sept. 16, 2024) .......... 11

*Hannant v. Culbertson Memorial Hospital Foundation, d/b/a/ Sarah D. Culbertson Memorial Hospital*,
2026 WL 777296 (S.D.N.Y March 19, 2026) .......... 11

*Hartley v. Univ. of Chicago Med. Ctr.*,
2025 WL 2802317 (N.D. Ill. Oct. 1, 2025) .......... 10, 11

*In re DoubleClick Inc. Privacy Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) .......... 7, 8, 19

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ... 5

*In re Google Inc. Cookie Placement Cons. Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) ... 5

*In re Grp. Health Plan Litig.*,
2023 WL 8850243 (D. Minn. Dec. 21, 2023) ... 11, 20

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. Dec. 22, 2022) ... 10, 12

*Kane v. Univ. of Rochester*,
2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) ... 7, 11

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ... 5

*Kurowski v. Rush Sys. For Health*,
2023 WL 8544084 (N.D. Ill. Dec. 11, 2023) ... 11, 20

*Martinez v. Mentavi*,
2025 WL 3780427 (W.D. Mich. Oct. 9, 2025) ... 19

*Mayer et al. v. Midwest Physician Adm. Serv., LLC*,
2025 WL 963779 (N.D. Ill. Mar. 31, 2025) ... 11

*Pattison v. Teladoc Health, Inc.*,
2025 WL 1756364 (S.D.N.Y. June 25, 2025) ... 11

*Ramirez v. LasikMD USA, Inc.*,
2026 WL 194855 (S.D. Cal. Jan. 26, 2026) ... 11

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), aff'd 745 F. App'x 8 (9th Cir. 2018) ... 12

*Smith v. Loyola Univ. Med. Ctr.*,
2024 WL 3338941 (N.D. Ill. July 9, 2024) ... 11

*Stein v. Edward-Elmhurst Health*,
2025 WL 580556 (N.D. Ill. Feb. 21, 2025) ... 11, 18

*Strong v. LifeStance Health Grp. Inc.*,
2025 WL 317552 (D. Ariz. Jan. 28, 2025) ... 11

*Sussman v. Am. Broadcasting Cos.*,
186 F.3d 1200 (9th Cir. 1999) ........................................ 8

*Theys v. Dental Intel., Inc.*,
2026 WL 636743 (N.D. Ill. Mar. 6, 2026)........................................ 11

*United States v. Jiau*,
734 F.3d 147 (2d Cir. 2013)........................................ 16

**Statutes**

42 U.S.C. § 1320(d)(6) ........................................ 8, 9, 17

Electronic Communications Privacy Act,
18 U.S.C. § 2511 *et seq.*........................................ 1, 7, 18

**Regulations**

45 C.F.R. § 160.103 ........................................ 9

45 C.F.R. § 164.514 ........................................ 10

## INTRODUCTION

This case is not about whether a hospital may advertise its services. It is about whether a HIPAA-covered entity may secretly intercept its patients' healthcare communications and disclose them, along with patient-identifying data, to third-party advertising companies without consent. Plaintiff alleges that Yale New Haven did exactly that. Rather than accept those allegations as true, Defendant repeatedly tries to reframe its conduct as ordinary "advertising" and asks the Court to resolve disputed factual questions about what information it disclosed, whether that information is entitled to protection, and why it made the disclosures. Those arguments fail at the pleading stage.

Plaintiff's Complaint plausibly alleges that Yale New Haven violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA") by installing and configuring tracking tools to intercept and disclose Plaintiff's private healthcare communications for the purpose of sharing his protected health information with unauthorized third parties in violation of the Health Insurance Portability and Accountability Act ("HIPAA"). That alleged unlawful disclosure brings Defendant's conduct squarely within the crime-tort exception to the ECPA's one-party consent rule. The arguments Defendant makes in support of dismissal all depend on excising allegations from the Complaint, minimizing the sensitive information actually disclosed, and treating disputed questions of fact – including Defendant's corporate mental state – as if they could be decided on the pleadings. They cannot. The motion should be denied.[1]

## FACTS

Yale New Haven Health Services Corp. ("YNH"), the operator of a hospital network, maintains a website, *www.ynhhs.org*, (the "Website") to communicate and exchange medical

[1] Plaintiff withdraws his claim for Negligence (Count II).

information with patients and prospective patients. Dkt. No. 1 ("Compl.") ¶¶ 5, 34. YNH encourages its patients, which number in the hundreds of thousands, to disclose their personally identifiable information ("PII") and protected health information ("PHI")[2] through its Website to schedule appointments, communicate medical symptoms, locate physicians and treatment facilities, search for medical treatment options, sign up for events and classes and more. *Id.* ¶ 5.

Notwithstanding YNH's absolute legal duty, professional obligations and express promises to maintain the confidentiality of its patients' Private Information, it intentionally installed a suite of third-party tracking technologies developed by Google, LLC, The Trade Desk, Inc., StackAdapt, Inc., and Adobe, Inc. (collectively, the "Tracking Tools") on its Website to surreptitiously intercept and disclose its patients' Private Information to unauthorized third parties. *Id.* ¶¶ 4-17, 47-93. The Tracking Tools are designed for commercial marketing and track every interaction made by patients on YNH's Website, including the text they type into Website fields, the pages they view and the buttons they click. *Id.* ¶¶ 10-17. Every time a patient communicates with Defendant's Website by clicking buttons or typing information, the Tracking Tools, unbeknownst to the patient, redirect the content of their communications to third-party digital advertising companies. *Id.* Contemporaneously with the interception of these communications, the Tracking Tools also collect and transmit several identifiers that uniquely identify a given patient, including their IP address, device identifiers, cookie identifiers and Google account-linked identifiers. *Id.* ¶¶ 15, 47-93.

Defendant's marketing vendors then combine these identifiers with the patients' healthcare communications and use this information for commercial purposes; namely, to build a fulsome

[2] PII and PHI are together referred to as "Private Information."

profile of the patient's preferences and traits, and to sell targeted advertisements. *Id.* ¶¶ 9, 14, 47-93. In exchange for the patients' valuable Private Information, Defendant's vendors compile and forward their analysis to YNH, which in turn uses the data for its own commercial purposes that includes understanding how people use its Website and more effectively targeting existing and prospective patients with its own advertisements. *Id.* ¶¶ 222-231.

James Williams has been a patient of YNH and a user of *www.ynhhs.org* since at least 2014. *Id.* ¶ 33. During the statutory period, Plaintiff used the YNH Website to schedule appointments, request information on specific medical services, research providers and locations, review financial assistance resources and login to Defendant's patient portal, called "MyChart." *Id.* ¶ 234. When Williams did so, YNH automatically and contemporaneously disclosed his Private Information to unauthorized third parties under the systematic process described above. *Id.* Plaintiff had no knowledge his sensitive medical information was shared with anyone other than his healthcare provider, or that it would be exploited for commercial purposes, and never consented or authorized YNH to disclose his Private Information. *Id.* ¶¶ 236-241.

The full scope of YNH's interceptions and disclosures of Plaintiff's communications to third parties, can only be determined through formal discovery. However, at minimum, Plaintiff confirmed and alleges that the following communications containing his Private Information were intercepted and disclosed to unauthorized third parties when he communicated through YNH's Website: (1) the content of the button Williams clicked was "Login" to MyChart or something substantially similar and the URL of the page Williams was directed to was "*mychart.ynhhs.org*"; (2) the content of searches for medical providers; (3) the content of URLs reflecting Plaintiff's viewing of a specific physician's page, including the physician's name, specialty, and location; (4) the content of communications confirming that Plaintiff booked an appointment with a specific

provider and the fact that Plaintiff submitted the booking form; (5) searches for the Smilow Cancer Center and visits to the cancer center location page; and (6) visits to pages concerning financial assistance and YNH's financial-assistance application. Compl. ¶ 234. Contemporaneously with the interception and disclosure of Plaintiff's communications on Defendant's Website, YNH also disclosed to its advertising vendors Plaintiff's personal identifiers, including but not limited to his IP address, cookie identifiers, device identifiers, and Google account-linked identifiers. *Id.* ¶ 234.

YNH disclosed its patients' Private Information despite affirmatively representing to Plaintiff and the class that it protects and maintains this information in strict confidence. During the statutory period, YNH's Notice of Privacy Policies represented that any use or disclosure not covered elsewhere requires the patient's written authorization. Compl. ¶ 128. The Notice conspicuously omits that YNH shares its patients' health-related data with third-party advertising and analytics providers. *Id.* YNH's Online Privacy Policy likewise represents that advertising-related disclosures are limited in scope. *Id.* ¶129. Specifically, the policy assures users: "We do not share identifying information such as names, email addresses, phone numbers, or any health information." *Id.*

Defendant's privacy disclosures do not disclose that patient interactions with healthcare provider pages, appointment scheduling tools, forms, or other health-related webpages are transmitted to third-party advertising and analytics companies through tracking technologies embedded on the Website. *Id.* ¶ 132. By intercepting and transmitting Plaintiff's and Class Members' interactions together with unique identifiers to third-parties, Defendant disclosed information well beyond what its privacy disclosures represented. *Id.* ¶ 133. YNH made these transmissions without obtaining the written authorization or informed consent that its own privacy materials state is an express condition of any marketing use or disclosure of their Private

Information. *Id.*

## FEDERAL RULE 12(b)(6) STANDARD

On a Rule 12(b)(6) motion to dismiss, the burden of proof is on the movant, and the court "draw[s] all reasonable inferences in Plaintiffs' favor, assum[ing] all well-pleaded factual allegations to be true, and determin[ing] whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (cleaned up). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard merely "require[s] enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) ("The proper question is whether there is a permissible relevant inference from all of the facts alleged, taken collectively, not whether an inference is permissible based on any individual allegation, scrutinized in isolation.").

## ARGUMENT

### I. PLAINTIFF PLAUSIBLY ALLEGES THAT YNH VIOLATED THE ELECTRONIC COMMUNICATIONS PRIVACY ACT.

To state a claim under the ECPA, a plaintiff must allege the defendant: "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015) (internal citations omitted). Plaintiff alleges that Defendant violated three distinct provisions of the ECPA, which proscribes (a) the *interception* of Plaintiffs' electronic communications, (c) the *disclosure* of

Plaintiffs' electronic communications and (d) *using* the contents of those electronic communications. *See* Compl. ¶¶ 265-293. In response, YNH says it can never incur ECPA liability because its conduct falls within the Act's "one party consent" exception. But Defendant ignores Plaintiff's well-pled allegations, which anticipate and specifically explain that because YHN's conduct constitutes a crime or tort, the exception upon which it relies cannot apply. The Court should reject Defendant's invitation to resolve disputed, dispositive facts at the pleading stage.

### A. The One-Party Consent Rule Does Not Apply Because Plaintiff Alleges that YNH Purposely Committed a Crime or Tort

Accepting YNH's argument for dismissal would require the court to ignore the specific alleged conduct which makes its interceptions unlawful—the unauthorized disclosure of protected health information. According to YNH, "even assuming there was an alleged disclosure of 'individually identifiable health information' at stake," its "purpose for this alleged disclosure was not nefarious," but was "merely to engage in marketing," and "[t]his purpose is not criminal, and this purpose is not tortious." Dkt. No. 17-1 at 13. But Plaintiff does not allege that marketing, in the abstract, violates the ECPA. He alleges that YNH installed and configured its Tracking Tools to intercept its patients' protected health information and send it, along with patient-identifying data, to unauthorized advertising vendors for commercial gain. That purpose – as Plaintiff's explicitly pleads – is what matters. Defendant cannot avoid the crime-tort exception by recasting the alleged unauthorized disclosure of protected health information as ordinary "marketing."

Where the crime-tort exception applies, the exception overrides the one-party consent rule of the Act. The crime-tort exception states in relevant part:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication … ***unless such communication is intercepted for the***

> ***purpose of committing any criminal or tortious act*** in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d) (emphasis added).

Criminal or tortious purposes may include "invading [a plaintiff's] privacy, defrauding her, or committing unfair business practices." *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 516 (S.D.N.Y. 2001) (quoting *Deteresa v. Am. Broad. Cos*., 121 F.3d 460, 467 n.4 (9th Cir. 1997). As explained below, the crime-tort exception applies and, at a minimum, requires resolution of disputed questions of fact. *See, e.g.*, *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *8 (W.D.N.Y. Mar. 19, 2024) ("Defendant may be able to show that, as a factual matter, that they did not intercept Plaintiffs' communications for that purpose. But at this stage of the proceedings, Plaintiffs, without the benefit of discovery, have plausibly alleged that the tort-crime exception applies."). Thus, the fact that YNH was a party to the communications does not shield it from liability.

### B. Because Plaintiff Plausibly Alleges that YNH Purposefully Violated HIPAA, It Is Subject to ECPA Liability Under the Crime-Tort Exception.

YNH is subject to liability under the "criminal or tortious exception" of the ECPA because, as Plaintiff alleges, it intercepted his communications for the purpose of disclosing his protected health information in violation of HIPAA. *See* 18 U.S.C. § 2511(2)(d); Compl. ¶¶ 280-288. Courts consistently interpret the crime-tort exception as requiring only, "sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) (emphasis added). In other words, "Under section 2511, 'the focus is not upon whether the interception itself violat[ed] another law; it is upon whether the purpose for the interception—**its intended use**—was criminal or tortious.'" *In re DoubleClick Inc.*, 154 F. Supp.

at 514 (emphasis added) (quoting *Sussman v. Am. Broadcasting Cos.,* 186 F.3d 1200, 1202–03 (9th Cir. 1999)).

Here, Plaintiff alleges that Defendant intercepted his healthcare communications for the purpose of disclosing his Private Information to unauthorized third-party digital advertising companies for its own commercial gain in direct violation of HIPAA. Compl. ¶¶ 47, 158, 280, 284. *See* 42 U.S.C. § 1320(d)(6). Defendant's Tracking Tools are used solely for commercial marketing. Compl. ¶¶ 51-93. Fundamentally, the **only way** YNH benefits from using these tools is by disclosing its patients' sensitive medical communications and linking these activities to their identities. This Private Information is then used by Defendant and its vendors to build advertising profiles and target patients with ads that relate to the healthcare activities they communicated on YNH's Website. *Id*. Thus, to realize these benefits, YNH had to make the conscious decision to install and configure its Tracking Tools to intercept and disclose its patients' statutorily protected health information to third-party advertisers. As a result, Defendant's alleged conduct fits squarely within the "criminal or tortious" carve-out to the "one-party consent" exception to the ECPA because it intercepted patient communications for the purpose of violating HIPAA.

HIPAA provides civil and criminal penalties to any covered entity that "knowingly… discloses individually identifiable health information ["IIHI"] to another person," without authorization. 42 U.S.C. § 1320(d)(6). IIHI is a subset of protected health information and defined as:

> [A]ny information, including demographic information collected from an individual, that— (A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify

> the individual.

45 C.F.R. § 160.103.

The communications YNH intercepted and disclosed to third parties are undeniably protected IIHI. Plaintiff alleges that the Tracking Tools intercept both the contents of patient communications with Defendant's Website (*i.e.*, the URLs, buttons, links, pages, and tabs patients click and view) and identifiers that uniquely identify the patient (*i.e.* the patient's IP addresses, cookie identifiers, device identifiers and account identifiers). Compl. ¶¶ 92-99. The Tracking Tools also intercept and disclose the communications patients make when they click the "Login" button to YNH's MyChart patient portal, along with appointment confirmation details including the provider's name. *Id.* ¶¶ 97, 234. Thus, for example, YNH reveals to its marketing vendors that a specific, identified patient has viewed pages related to cancer treatments, clicked on a provider's profile, and scheduled an appointment with a specific provider. Therefore, YNH may be prosecuted and incur liability under HIPAA, 43 U.S.C. § 1320(d)(6), because the data it discloses is received by a health care provider, identifies the individual, and is related to their past, present, or future physical or mental health or condition, their receipt of health care, and/or their payment for that care.

Contemporaneously with each disclosure of a patient's healthcare communication, YNH's Tracking Tools also disclose personal identifiers that allow the intercepted PHI to be associated with a specific patient for advertising targeting. Once those identifiers are linked with the patient's healthcare communications, the resulting data constitutes IIHI. As Plaintiff details in his Complaint, under the HIPAA de-identification rule:

> health information is not individually-identifiable only if… the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> (a) Names; (b) Medical record numbers; (c) Account numbers; (d) Device identifiers and serial numbers; (e) Web Universal Resource Locators (URLs); (f) Internet Protocol (IP) address numbers;… and (g) Any other unique identifying number, characteristic, or code.

SAC ¶ 125; *See* 45 C.F.R. § 164.514.

Although the disclosure of just one of these identifiers gives rise to liability, Plaintiff alleges that YNH's Tracking Tools disclosed at least <u>four</u> identifiers that are specific to Plaintiff, including his cookie identifiers and account-linked identifiers which qualify as a "unique identifying numbers." Compl. ¶¶ 234-235. That is more than enough at the pleading stage: Plaintiff does not allege that YNH disclosed anonymous website activity, but rather that it disclosed healthcare communications together with identifiers that HIPAA itself treats as rendering health information individually identifiable.

Plaintiff also alleges that Defendant disclosed Plaintiff's status as a patient by contemporaneously pairing his identifiers with his action of clicking the "Login" button to the MyChart patient portal. Compl. ¶¶ 234-235. HIPAA protects the disclosure of patient status. *Id.* ¶¶ 146-153. Courts have recognized that this exact type of disclosure can reveal patient status protected by HIPAA because it "connects a particular user to a particular healthcare provider." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792-793 (N.D. Cal. Dec. 22, 2022); *see also Hartley*, 2025 WL 2802317 at *4-5. Accordingly, Plaintiff more than adequately alleges that YNH violated HIPAA by knowingly configuring its Tracking Tools to disclose his status as a patient to advertisers.

While acknowledging its status as a HIPAA-covered entity, YNH contends that the healthcare communications it disclosed "are not subject to, and thus also do not violate, HIPAA," merely because they occurred on a public website. *See* Dkt. 17-1 at 16-18. Courts across the

country have repeatedly rejected this narrow view of PHI in materially similar tracking-tool cases, holding that communications on a healthcare provider's public webpages can contain PHI under HIPAA. *See e.g. Hannant v. Culbertson Memorial Hospital Foundation, d/b/a/ Sarah D. Culbertson Memorial Hospital*, 2026 WL 777296, at *6-8 (S.D.N.Y March 19, 2026); *Pattison v. Teladoc Health, Inc.*, 2025 WL 1756364 at *3 (S.D.N.Y. June 25, 2025); *Kane*, 2024 WL 1178340, at *6-7; *Gay v. Garnet Health*, 2024 WL 4203263, at *3-4 (S.D.N.Y. Sept. 16, 2024); *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 380–81 (S.D.N.Y. July 30, 2024).[3]

Here, Plaintiff's Complaint identifies specific descriptive URLs and related website-interaction data that Williams provided and YNH contemporaneously disclosed through its Tracking Tools, revealing the substance of his healthcare-related communications and activity on YNH's Website, including: (1) URLs from Yale's Website that show Williams logged into the MyChart portal; (2) the content of searches for medical providers; (3) the content of URLs reflecting Plaintiff's viewing of a specific physician's page, including the physician's name, specialty, and location; (4) the content of communications confirming that Plaintiff booked an appointment with a specific provider and the fact that Plaintiff submitted the booking form; (5) searches for the Smilow Cancer Center and visits to the cancer center location page; and (6) visits to pages concerning financial assistance and YNH's financial-assistance application. *See* Compl. ¶ 234.

[3] *See also B.N. v. Oregon Reproductive Medicine, LLC*, *d/b/a ORM Fertility*, 2026 WL 915343, at *5 (D. Or. April 3, 2026); *Theys v. Dental Intel., Inc.*, 2026 WL 636743, at *12-13 (N.D. Ill. Mar. 6, 2026); *Ramirez v. LasikMD USA, Inc.*, 2026 WL 194855, at *3 (S.D. Cal. Jan. 26, 2026); *Hartley v. Univ. of Chicago Med. Ctr.*, 2025 WL 2802317 (N.D. Ill. Oct. 1, 2025); *Mayer et al. v. Midwest Physician Adm. Serv., LLC*, 2025 WL 963779, at *1-3 (N.D. Ill. Mar. 31, 2025); *Strong v. LifeStance Health Grp. Inc.*, 2025 WL 317552, at *4-5 (D. Ariz. Jan. 28, 2025); *Smith v. Loyola Univ. Med. Ctr.*, 2024 WL 3338941, at *5-6 (N.D. Ill. July 9, 2024); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *9 (N.D. Ill. Feb. 21, 2025); *Kurowski v. Rush Sys. For Health*, 2023 WL 8544084 (N.D. Ill. Dec. 11, 2023); *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *3, *7–8. (D. Minn. Dec. 21, 2023);

Citing *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017), aff'd 745 F. App'x 8 (9th Cir. 2018), YNH characterizes the Private Information it disclosed as merely "general health information that is accessible to the public at large." Dkt. No. 17-1 at 17 (quoting *Smith*, 262 F. Supp. 3d at 955). Defendant's reliance on *Smith* is puzzling. First, the healthcare defendants in that case were dismissed on jurisdictional grounds, not plaintiffs' substantive claims against those parties. *Id*. at 952. The Court's substantive analysis applied only to Facebook. *Id*. at 953-55. The distinction is critical because plaintiffs in *Smith* merely visited general health information websites such as cancer.net; they were not communicating with the website of their specific medical provider. Second, unlike *Smith*, Plaintiff alleges that the Tracking Tools were operating on Defendant's Website and that he accessed Defendant's Website to book medical appointments. Compl. ¶ 234.

That YNH's Tracking Tools operated on webpages where patients booked appointments and transmitted that information to third parties makes *Smith* distinguishable. The booking of a medical appointment by a patient is hardly "general health information … accessible to the public at large." And in further contrast to *Smith*, such information does "relate to the past, present, or future physical or mental health or condition of an individual." *Smith*, 262 F. Supp. 3d at 955. Courts have consistently held *Smith* is distinguishable and inapplicable to a hospital's use of Tracking Tools to improperly disclose patient status. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793 (denying motion to dismiss and finding "[u]nlike in *Smith*, then, the Pixel captures information that connects a particular user to a particular provider— i.e., patient status— which falls within the ambit of information protected under HIPAA."). Plaintiff alleges that he is a patient of Defendant, which means YNH is his healthcare provider. Compl. ¶¶ 33, 232-234. Moreover, Plaintiff alleges that Defendant's Website discloses and transmits information to third

parties that he, as Defendant's patient, communicated to YNH via its Website, including his scheduling of appointments and other interactions on the Website as part of his continuum of care. *Id*. ¶¶ 232-234. Unlike in *Smith*, this information is specific to Plaintiff and directly relates to "the past, present, or future physical or mental health or condition of an individual."

Finally, Defendant downplays guidance from the Department of Health and Human Services' ("HHS") concerning tracking technologies, arguing that the Bulletin cited in Plaintiff's complaint was invalidated in *American Hospital Association v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024), and has not been reissued. *See* Compl. at ¶¶ 130-137; *cf.* Dkt. No. 17-1 at 3. But Defendant overstates the significance of *Becerra* and ignores the current HHS guidance. The court in *Becerra* vacated only the portion of HHS's Bulletin addressing the narrow "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a[n] [unauthenticated public webpage] addressing specific health conditions or healthcare providers." *Becerra*, 738 F. Supp. 3d at 789; *see also* HHS Bulletin.[4] Plaintiff alleges far more than the disclosure of an IP address plus a generic page visit. Williams alleges that Defendant disclosed descriptive URLs and other information reflecting his and other patients' healthcare activity, including searches, doctor selections, appointment-related activity, and identifiers capable of linking that activity to a specific individual. Compl. ¶¶ 92-107, 234-235. Contrary to Defendant's suggestion, HHS has not abandoned its guidance. The current Bulletin continues to state that tracking technologies are capable of disclosing information typed or selected by users, dates of appointments, device IDs, "or any unique identifying code," and that these technologies

[4] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June. 18, 2026).

on unauthenticated webpages may have improper access to PHI where the information relates to an individual's past, present, or future health care.[5] Accordingly, *Becerra* does not defeat Plaintiff's Complaint.

All these facts, taken together and accepted as true, state a plausible claim that YNH used its Tracking Tools to intercept and disclose statutorily protected Private Information in violation of HIPAA. Because Plaintiff alleges facts showing that the crime-tort exception applies, Plaintiff states a viable claim under the ECPA and Defendant's motion should be denied.

### C. The Plain Text of the ECPA, Along with Binding Precedent and Legislative History, All Confirm That Liability Turns on Whether the Intended Use of the Intercepted Communications Was to Commit a Criminal or Tortious Act.

YNH devotes the majority of its brief to a reading of the ECPA's crime-tort exception that cannot be reconciled with the statute's plain text or binding Second Circuit authority. Defendant asks this Court to redo the legislative-history analysis already performed by the Second Circuit in *Caro*, where it held that the crime-tort exception turns on whether the defendant "intend[ed] to use the recording to commit a criminal or tortious act." *Caro*, 618 F.3d at 99. Defendant's invitation to ignore *Caro* and replace its straightforward rule with a tortured reading of the exception ignores both fundamental principles of *stare decisis* and the plain text.

To survive a motion to dismiss based on the crime-tort exception, a plaintiff need only plead facts sufficient "to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording." *Caro*, 618 F.3d at 100. In *Caro,* the Second Circuit held that "[i]f, at the moment he hits 'record,' the offender does not intend to use the recording for criminal or tortious purposes, there is no violation. But if, at the time of the recording, the offender plans to use the recording to harm the

[5] *Id.*

other party to the conversation, a civil cause of action exists under the Wiretap Act." *Id*. Here, Plaintiff specifically alleges that Defendant committed a criminal act independent of the interception itself: the hidden disclosure of Private Information without consent as required by HIPAA. That alleged purpose, not the mere interception of patient communications, is what brings Defendant's conduct within the crime-tort exception.

Unable to square its conduct with *Caro's* actual standard, Defendant retreats into an extended legislative-history exercise that the Second Circuit in *Caro* already performed. YNH devotes six pages parsing through the ECPA's legislative history and *Caro's* analysis to manufacture a new rule that would permit the very conduct alleged here: intercepting private healthcare communications for the purpose of secretly disclosing them to third-party marketing vendors in violation of HIPAA. But the exercise only confirms Plaintiff's point. The portion of *Caro* that Defendant conveniently omits is the portion that matters most. There, the Second Circuit explained that the crime-tort exception was designed to reach abuses arising from the *intended use* of the intercepted communication, not merely the act of interception itself:

> The language and history of the Wiretap Act indicate that Congress authored the exception to the one-party consent rule to prevent abuses stemming from use of the recording not the mere act of recording.
>
> …
>
> At first glance, the legislative history suggests that invasion of privacy was a tort Congress intended to reach in the Wiretap Act. When Senator Hart proposed the amendment that forbade interception when one party to the conversation operated with tortious or criminal intent, he noted that the blanket one-party consent rule left "wide open the problem of ... many ... abuses of the right of privacy." 114 Cong. Rec. 14694 (1968). However, he then went on to distinguish the injuries he wished to avoid through the amendment "blackmailing the other party, threatening him, or publicly embarrassing him"— from "legitimate" uses like protection from "later distortions or other unlawful or injurious uses by the other party." *Id*. It was not invasion of the right of privacy *per se* that Senator Hart wished to avoid through his proposal**, but invasions and abuses that would result through use of the interception itself**.

*Caro*, 618 F.3d at 101 n.8. (emphasis added).

Thus, while Plaintiff agrees that the proper standard is set forth in *Caro*, the facts of that case are distinguishable. In *Caro*, the plaintiff's criminal or tortious exception theory failed because the underlying tort arose from the interception itself, not an independent use of the recorded communication. *Id.* at 101-102. In contrast, Defendant's act of interception itself is not the completion of the tort, it is merely a step in the invasion. YNH, aware that it is unlawful for a HIPAA-covered entity to share patient information without consent, nevertheless installed and configured the Tracking Tools to disclose those communications to third-party marketing vendors for advertising purposes in violation of federal law. The independent purpose therefore is not the interception, but the disclosure of a patient's intercepted communications to third parties so they could be used to identify the patient and violate their right to privacy in their private medical communications. Defendant violated this expectation of privacy, and the federal statutes defining that right, and as such cannot take refuge under the party exception to the ECPA.

Defendant's reliance on *United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013) fares no better. *See* Dkt. No. 17-1 at 8-9. The *Jiau* court rejected an argument that the crime-tort exception applied merely because the underlying conversations themselves furthered insider trading, holding that courts look to "why the calls were recorded and not why the calls were made." *Jiau*, 734 F.3d at 152. Plaintiff's theory is different. Williams does <u>not</u> allege that the exception applies because his communications with YNH's Website concerned healthcare. Plaintiff alleges the exception applies because Defendant intercepted those communications for the purpose of disclosing their contents to third-party marketing vendors in violation of HIPAA. *Jiau* therefore reinforces *Caro's* rule: the

relevant inquiry is the *intended use* of the intercepted communications. Here, that intended use was the unlawful disclosure of protected health information.

**D. YNH Cannot Avoid the Crime-Tort Exception by Recasting Its Intentional, Unlawful Disclosure of PHI as Mere "Advertising"**

YNH's argument ultimately reduces to a simple but mistaken proposition: because YNH characterizes its objective as "advertising", it could not have intended to commit a criminal or tortious act. That is not the standard. A defendant cannot avoid § 2511(2)(d) by recasting the unlawful disclosure of protected health information as ordinary marketing, or by insisting it did not mean to "hurt" anyone. The relevant question is whether YNH intercepted Plaintiff's communications for the purpose of using them in a way that violated Plaintiff's privacy rights. Plaintiff plausibly alleges that it did.

Rather than apply the pleading standard adopted by courts around the country, Defendant tries to graft a new requirement onto both the ECPA and HIPAA: that Plaintiff must plead an intent to cause some additional harm beyond the unlawful disclosure itself. No such requirement exists. Relying on a series of criminal cases, none of which involve the ECPA or HIPAA, YNH claims that because certain sections of the ECPA provide criminal penalties, Plaintiff is required to plead that it acted with "specific intent" to commit a crime to satisfy the "criminal *or tortious*" exception to the ECPA. Dkt. No. 17-1 at 9-13.

The problem with Defendant's novel interpretation is two-fold. First, proof of specific intent is not required to establish a violation of HIPAA or ECPA. When covered entities are prosecuted under 42 U.S.C. § 1320d-6, the statute's "knowingly" element "requires only proof of knowledge of the facts that constitute the offense," not any specific intent to cause additional

harm.[6] *See also* Compl. ¶¶ 152-154. In addition, the ECPA's plain text and legislative history do not impose any "criminal intent" requirement to satisfy the "criminal *or tortious*" exception to the ECPA.[7] *See* 18 U.S.C. § 2511(2)(d).

Second, even if YNH could cite an ECPA case that adopts its preferred requirement (it cites none), Plaintiff's allegations would still satisfy it. As explained *supra*, YNH could only obtain the advertising benefits of the Tracking Tools by disclosing its patients' statutorily protected medical communications to third-party advertisers, linking those communications to patient identifiers, and using that data for targeted advertising. Compl. ¶¶ 51-93, 111-120. That was not incidental to the interception; it was the whole point of installing and configuring the Tracking Tools in the first place.

Nevertheless, Defendant claims that because its ultimate objective was financial gain, and making money is not itself a crime, it could not have acted with a criminal purpose when it surreptitiously disclosed its patients' protected health information without consent. Dkt. No. 17-1 at 11-16. But as at least one district court found when confronting the same argument on nearly identical tracking-tool allegations:

> Even if the carve-out required a criminal or tortious purpose, it would be odd to exclude an otherwise criminal or tortious act solely because it was also motivated by financial gain. The existence of an underlying financial motivation does not mean that the act lacked a criminal or a tortious purpose. That's like saying that a bank robber's purpose was not to commit a crime – it was to make money.

---

[6] *Scope of Criminal Enforcement Under 42 U.S.C. § 1320d-6*, 29 Op. O.L.C. 76 (2005), https://www.justice.gov/olc/opinion/scope-criminal-enforcement-under-42-usc-1320d-6. (last accessed June 22, 2026).

[7] Defendant's discussion of the ECPA's legislative history only confirms that the statute contains no separate "specific intent" requirement for the crime-tort exception. *See* Dkt. No. 17-1 at 6-7.

*Stein*, 2025 WL 580556 at *6.[8]

Likewise, our case is distinguishable from the two cases Defendant says support its claim that privacy violations resulting from internet tracking tools cannot satisfy the ECPA crime-tort exception. Dkt. No. 17-1 at 15 (citing *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) and *Cohen v. Casper Sleep, Inc.*, 2018 WL 3392877 (S.D.N.Y. July 12, 2018)). YNH is a HIPAA-covered provider which encourages patients like Plaintiff to use its platform for the provision of healthcare services, then uses that very platform to collect Private Information and surreptitiously disclose it to Google and other third-parties. By contrast, *In re DoubleClick* challenged an internet advertiser who, after an FTC investigation, was found to have "never used or disclosed consumers' [personal information] . . . for purposes other than those disclosed in its privacy policy," and created profiles for users that contained "only non-PHI." 154 F. Supp. 2d at 500, 506 (emphasis added). Similarly, *Cohen* involved a defendant whose very business was marketing. *Cohen*, 2018 WL 3392877 at *1, *4.

Of course, here the FTC and HHS have specifically targeted conduct like that committed by YNH, and Plaintiff alleges that Defendant does not disclose to Plaintiff or class members that it shares their Private Information with unauthorized third parties. Compl. ¶¶ 126-141. Furthermore, Plaintiff alleges that Defendant collects and discloses Private Information it knows is protected—disclosures deemed "impermissible" under HIPAA, industry standards, and Defendant's own privacy policies—whereas those in *In re Doubleclick* did not include PHI and were expressly set out in Doubleclick's privacy policy. 154 F. Supp. 2d at 506-07, 514-15. Additionally, Plaintiff respectfully submits that the lone case cited by Defendant, *Martinez v.*

[8] *See also Sussman*, 186 F.3d at 1202 ("The existence of the lawful purpose would not sanitize a tape that was also made for an illegitimate purpose; the taping would violate section 2511").

*Mentavi*, 2025 WL 3780427, at *3-5 (W.D. Mich. Oct. 9, 2025), which found that alleged violations of HIPAA cannot satisfy the crime-tort exception, is an outlier that was wrongly decided and cannot be reconciled with the rationale in the substantial body of authority reaching the opposite conclusion. *See* Note 3 *supra*.

Finally, whether YNH had criminal or tortious intent is inherently a question of fact which can be resolved only on a full evidentiary record. *See, e.g.*, *Kurowski*, 2023 WL 8544084, at *3 (observing that plaintiff "lacks the direct access to what occurs in the background on Rush's web properties"); *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *7–8 ("[D]etermination of [defendant]'s actual purpose for . . . using the Pixel Code requires a factual undertaking."). Precisely because Plaintiffs "may be able to show" that the crime-tort exception applies at a later, fact-intensive stage, courts have held that it is improper to dismiss a suit at the pleading stage based on the single-party consent defense under § 2511(2)(d). *See Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) (explaining that even where defendant "obviously consented to the recording, [] that does not justify dismissing the suit").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny YNH's Motion to Dismiss and award all such other relief as equity and justice require.

Date: June 22, 2026

Respectfully submitted,

By: */s/ Michael J. Casas*

**STEPHAN ZOURAS, LLC**
James B. Zouras (admitted *pro hac vice*)
Ryan F. Stephan (admitted *pro hac vice*)
Teresa M. Becvar (admitted *pro hac vice*)
Michael J. Casas (admitted *pro hac vice*)

222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
jzouras@stephanzouras.com
rstephan@stephanzouras.com
tbecvar@stephanzouras.com
mcasas@stephanzouras.com

Deborah L. McKenna
**Hayber, McKenna & Dinsmore, LLC**
472 Wheelers Farms Rd, Suite 300
Milford, CT 06461
Ph: (203)691-6491
Fax: (860)218-9555 CT 17326

*Attorneys for Plaintiffs & the Putative Class*

## **CERTIFICATE OF SERVICE**

I, the attorney, hereby certify that on June 22, 2026, I filed the attached with the Clerk of the Court using the Court's electronic filing system and will send such filing to all attorneys of record.

*/s/ Michael J. Casas*